[No. S004729. Crim. No. 25803. Apr. 23, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH INTERNATIONAL THOMAS, Defendant and Appellant.

490

**COUNSEL**

Alex Reisman, under appointment by the Supreme Court, Colman, Reisman, Bourdon & Bourdon and Nancy Colman for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Robert R. Granucci and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—A jury convicted Ralph International Thomas of the second degree murder of Mary Gioia and the first degree murder of Greg Kniffin (Pen. Code, § 187),[1] finding true allegations that he used a firearm in the commission of each of the murders. (§ 12022.5.) The jury also found true a multiple-murder special-circumstance allegation and fixed the penalty at death. (§ 190.2, subd. (a)(3).) This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. GUILT PHASE

### A. *Evidence.*

#### 1. *Prosecution's case-in-chief.*

##### a. *Introduction.*

During the early morning hours of August 16, 1985, Mary Gioia and Greg Kniffin were beaten and shot at point-blank range near the Rainbow Village compound in the City of Berkeley.[2] Defendant was convicted of their murders. The prosecution's case consisted entirely of circumstantial evidence falling generally into the following categories: defendant's ownership of a rifle that could have inflicted the fatal wounds; defendant's presence in the company of the victims not long before the killings; defendant's conduct and statements after the killings, reflecting consciousness of guilt; and certain physical evidence.

The circumstantial nature of the evidence makes it necessary to set forth the facts of this case in unusual detail.

##### b. *Victims' backgrounds.*

Patricia Gioia, Mary's mother, and David Kniffin, Greg's father, testified regarding the victims' backgrounds and how they came to be in Berkeley at the time of their deaths. Mrs. Gioia testified that Mary, 22 years old at her

---

[1]Further unspecified statutory references are to the Penal Code.

[2]In early 1985, the City of Berkeley set aside a landfill area near the Berkeley Marina to provide living space for people who had previously been living in their vehicles on the public streets. The area became known as Rainbow Village. Defendant lived at Rainbow Village with his girlfriend, Lenise Allen. On August 15 and 16, 1985, a number of followers of the Grateful Dead rock band were staying at Rainbow Village because the band was scheduled to play locally during the coming weekend. Among them were Mary Gioia and Greg Kniffin.

death, came to California to look for work as a baker. Mr. Kniffin testified that Greg, 18 years old at his death, quit his job in June 1985 and came to California to seek a new direction.

### c. *Forensic evidence.*

Dr. John Iocco, a pathologist with the Institute of Forensic Sciences, testified that he performed autopsies on the bodies of the victims. Mary's body was clothed in blue denim shorts over purple running pants, a blue sweatshirt, a white pullover shirt, a white slip, athletic socks and running shoes. The upper snap of the shorts was undone and the zipper was substantially down. The right side of her face bore a gunshot entry wound; the exit wound was on the left side of her face. There were multiple bruises and contusions and other signs of blunt trauma to the body, all of which appeared to have been inflicted before Mary's death. Additionally, her back bore approximately 100 post mortem abrasions, probably the result of being dragged over asphalt or dirt. The gunshot entry wound had lacerated the carotid arteries and jugular veins; the neck and face showed multiple bony fractures as a result of the wound. The top of the voice box, or epiglottis, was lacerated. There was a hinging fracture of the skull and blood in the brain. There was also extensive fracturing of the jaw and teeth.

Dr. Iocco testified that there was a three-inch by seven-and-one-half-inch combined entry and exit gunshot wound on the left side of Greg's neck. There were lacerations and bruises on the face, neck, and arm, and over each knee. All of these injuries were inflicted prior to Greg's death. Dr. Iocco testified that bruising below the beard area on Greg's neck could have been caused by a choking hold. Greg's back bore scratch marks that could have resulted from falling down or being dragged. The cause of Greg's death was the effects of the gunshot wound to his neck.

Toxicological tests showed that Mary's blood-alcohol level at the time of her death was .06 percent. Similar tests showed that Greg's blood-alcohol level at the time of his death was .11 percent. Both victims tested negative for narcotics and stimulants. Neither victim was tested for marijuana use. Swabs taken from the mouth, genital, and rectal areas of the victims tested negative for the presence of sperm and seminal fluid.

Jack F. Richardson, a firearms expert, described the differing ballistic properties of .44 magnum handguns and rifles. Based on his examination of post mortem photographs of Mary Gioia's wounds, he opined that the exit wound would be normal for a high-powered rifle or shotgun, but was inconsistent with any he had seen made by a handgun. Richardson testified that the .44 magnum is the most powerful handgun on the market.

### d. *Defendant's ownership of .44 magnum rifle.*

On August 14, 1985, Lenise Allen, defendant's girlfriend, traded a Remington .44 magnum Model 788 rifle, serial number 041747, to defendant after he repaid a debt he had owed her. She had acquired the rifle in April 1985 from Martin Barbena.

Martin Barbena described the peculiarities of the Model 788 rifle. On the basis of Barbena's testimony, the prosecutor argued that only a person familiar with that model rifle could have committed the murders, hence that defendant, the owner of the rifle, was the killer. Barbena testified that the rifle had no clip, but could be fired by handloading each round into the chamber. The breech was recessed, so a user had to push each round fully into place, or there was a chance of jamming. If a bullet were half in and half out, Barbena testified, it would tend to simply hang; if it were out any more than that, it would fall out through the space for the charge clip.

Defendant kept the rifle in a leather case either in the luggage rack on top of his car or behind the car's bucket seats. He stored ammunition in a Tupperware container which he kept inside the car. David Bergman, a Rainbow Village resident, testified that about a month before the murders he saw defendant using the rifle for target practice at a dump site near the village.

### e. *Testimony of Rainbow Village residents regarding events of August 15 and 16.*

The testimony of several Rainbow Village residents, although imprecise and somewhat inconsistent as to time, placed defendant in the company of the victims during the night of the murders and established that defendant had fired his rifle earlier that evening. One resident also testified that he saw defendant in the area where the victims were killed early the following morning.

Thomas Medlin, a Rainbow Village resident, testified that just before sunset on August 15, 1985, defendant fired his rifle at a Canadian flag that Harry Shorman, another village resident, had mounted on his bus.

Jim Prew testified that sometime after 10 p.m. on August 15, defendant and the victims were among a group of people that included Prew, Chris Campbell, and Paul Harter, who were drinking beer in Prew's van at Rainbow Village. Defendant was wearing a dark jacket and jeans. About 1 a.m. on August 16, Prew agreed to drive Chris Campbell to his home in

Richmond. All except Greg rode along. After dropping Campbell off, the group drove to a convenience store where they bought burritos, beer, and ale. On the way back to Rainbow Village, they picked Greg up along an access road near University Avenue, arriving about 1:50 a.m. or 2 a.m. The group stood around drinking for a while. About 3 a.m., Mary and Greg announced they were going to take a walk. Around that same time, defendant too left without saying where he was going.

Vincent Johnson testified that he spent the hours between midnight and about 2 a.m. on the night of August 15-16 visiting with a woman friend in his bus at Rainbow Village. Because the friend was afraid to drive on the access road by herself, Johnson rode along with her as far as University Avenue on her departure. After she dropped him off, Johnson walked back to the village alone. Near the landfill office, he saw defendant, who is Black, with a young White couple. Johnson passed within 15 to 20 feet of them. Defendant was standing and staring into space. He appeared to be angry.

Tracy Scarborough testified that at 9 or 9:30 p.m. on August 15, after spending the evening with a friend on University Avenue, he returned to Rainbow Village. He was "pretty drunk" at the time, and went to sleep in the front seat of defendant's car, an inoperable blue Opel station wagon. Around sunrise on the morning of August 16, Scarborough was awakened by the slamming of the car's hatchback door. He looked up and saw someone walking past the front of the car, but did not see who it was. He went back to sleep. Later that morning Scarborough woke again and saw defendant, who was then wearing camouflage pants.

Calvin Wylie testified that he worked as a carpenter in Oakland and stayed at Rainbow Village during the work week. He habitually left for work at 6:30 a.m. On the morning of Friday, August 16, 1985,[3] while driving to work down the access road from Rainbow Village, Wylie saw defendant bending down near a weed cutter by the side of the road. He appeared to be looking through some plastic bags that had been dumped there. Defendant was wearing camouflage-type clothing. He looked at Wylie. Seeing that defendant did not want a ride, Wylie drove on.

### f. *Discovery of bodies.*

Sometime after sunrise on August 16, a body was seen floating in the bay. Berkeley Police Detective Fred Eihl arrived at the Berkeley Dump landfill

---

[3]Wylie expressed some doubt as to whether he saw defendant on August 15 or August 16, but asserted that defendant was wearing camouflage clothing when he saw him. Testimony of other witnesses establishing that defendant was wearing dark clothing on August 15 and camouflage clothing on August 16 tended to resolve the question of the date of Wylie's observation.

area shortly after 11 a.m. Other police officers, as well as a number of civilians, were already at the scene.

Detective Eihl testified that he was standing about 30 feet from the body, which was floating facedown. Some white of the upper clothing was visible, but neither the face nor the legs could be seen. Defendant was standing about 15 feet behind Eihl, or about 45 feet from the body. As personnel from the coroner's office began to remove the body from the water, while the face was still not visible and before Eihl could tell whether the body was male or female, defendant said, "That's Mary."

On August 17, police divers recovered Greg's body from the bottom of the bay at a point 30 feet from the shore.

### g. Defendant's statement to Detective Eihl on August 16.

Because defendant had made a tentative identification, Eihl asked him for more information. Defendant told Eihl that he knew the victim only as Mary and that they had washed dishes together at Rainbow Village two nights earlier. Asked when he last saw Mary, defendant said they had partied the night before in a van just outside the gate. Defendant's account of the party was generally similar to that provided by Jim Prew. He named the others in the group and said that all except Greg had gone to Richmond with Chris. On the way back from Richmond, defendant said, they stopped to buy beer. Coming down the dump road, they picked Greg up and drove back to Rainbow Village. Shortly after that, according to defendant, the party broke up and everybody went their separate ways. Eihl asked defendant what he did after that. Defendant told him he saw Mary and Greg as he was walking out the dump road from Rainbow Village to Ledger's Liquor Store. Mary and Greg asked him for a match;[4] defendant stopped to give them one and smoked some marijuana with them. He then proceeded to Ledger's, but found it closed and returned to the village. He got some money and went to various locations to try to purchase some marijuana. When it grew light out, he went to a laundromat in the area of University and San Pablo Avenues. After finishing his laundry, he returned to Rainbow Village.[5] There he ran into Harry Shorman, who told him there was a body floating in the water. Defendant told Eihl he went down to observe.

### h. Defendant's statements to other Rainbow Village residents.

David Bergman testified that he saw defendant around 9 a.m. or 10 a.m. on August 16. Defendant told Bergman that his rifle was missing. Bergman

---

[4]Although defendant claimed the victims needed a match, a waterlogged book of matches was recovered from Mary's clothing.

[5]The total round-trip distance involved in defendant's narrative was calculated to be 16.8 miles.

was unsure whether defendant had told him this before or after Bergman learned that a body had been found in the water. Bergman advised defendant to report the theft to the police. Both Thomas Medlin and Tracy Scarborough also testified that on the morning of August 16 defendant told them his rifle was missing.

Later that day, Scarborough advised defendant that he had been awakened about 6 a.m. by the slamming of the hatchback door of defendant's car. He asked if it was defendant who slammed the door. Defendant denied it, saying he was not around there at that time but was "uptown." The following day, after Greg's body was found, defendant told Scarborough he thought he would be in trouble because his rifle was missing; he was worried that his gun had been used to shoot both victims.

Thomas Medlin testified that after Mary's body was found, defendant asked him to hold his gun cleaning kit for a while. Medlin took the kit and hid it in his car. Later, defendant asked Medlin to hide the Tupperware container that defendant used to hold his ammunition, but Medlin refused and gave him back both the gun cleaning kit and the container with the ammunition.[6] Defendant told Medlin he had been "dumpster diving" (i.e., searching for salvageable items) all the previous night and had been back and forth from the village into town several times.

### i. *Defendant's statement to Inspector Wolke on August 17.*

On August 17, Berkeley Police Inspector Daniel Wolke interviewed defendant at Rainbow Village. The interview was not recorded. Defendant's statement generally agreed with what he had earlier told Detective Eihl, with certain discrepancies. In the August 17 interview, defendant said that Greg was not at the party in Jim Prew's van; in the earlier interview, he had said Greg was present. Additionally, he described his encounter with Mary and Greg near the landfill office somewhat differently to Wolke than he had to Eihl. When he met Mary and Greg about 1:30 a.m. on his way to Ledger's Liquors, defendant told Wolke, they asked him for some marijuana and he shared some with them, smoking it in his corncob pipe. He said he also drank beer with them. Defendant claimed he must have lost his pipe at that time. Defendant said he got his laundry from his car about sunrise.

Defendant refused to tell Wolke whether he knew anyone at Rainbow Village who owned firearms. Asked if he owned any guns, defendant said he

---

[6]Medlin testified that other village residents asked him to hide weapons on August 16, due to a belief that Rainbow Village was going to be searched. Bill Caruthers asked Medlin to hide a .22 Remington pump action rifle. Harry Shorman brought Medlin a billy club.

had a Remington .44 magnum bolt action rifle without a clip. He recited the serial number from memory. When Wolke asked to see the rifle, defendant told him it had been stolen late Thursday afternoon or Thursday evening. Defendant showed Wolke a lidded Tupperware container and claimed that the 10 or 11 bullets he had kept in it were missing. Wolke asked if defendant had made a police report or told anyone the gun had been stolen; defendant said no. Defendant said he had last fired it at Harry Shorman's flag on Thursday evening.

### j. *Defendant's statement to Inspector Wolke on August 20.*

Wolke testified that on August 19, at Rainbow Village, defendant said he wanted to report his rifle as stolen. Wolke offered to take the report then, but defendant said he would come to the police department on the following day. Detective Wolke testified that on August 20, at 1:45 p.m., defendant came to the police department to make a formal report.

In an unrecorded statement, defendant described the rifle to Wolke and again recited the serial number from memory. He told Wolke he had purchased it for $125 in April 1985 from a White male named Bill on Durant, east of Telegraph Avenue. He was unable to describe Bill.

Defendant gave another account of the events of August 15-16, more detailed than his earlier statements and inconsistent with them in some respects. He told Wolke that just before dark on August 15, he had gone with David Bergman and Melody Medlin, Thomas Medlin's wife, to liquor stores on University Avenue. Defendant purchased some ale. After returning to Rainbow Village, defendant ran into Tracy Scarborough. He and Tracy drank ale and smoked marijuana in defendant's car. About 9 p.m., Scarborough fell asleep. Defendant joined Mary, Jim Prew, Chris Campbell, and Paul Harter at Jim's van and drank with them. They were drinking whiskey, and defendant returned to his car to get a pint bottle of Wild Turkey.

Later in the evening, Chris asked for a ride to Richmond, so they all got in the van and drove out to Richmond. At the San Pablo Dam Road exit, they went to a convenience store and bought burritos and beer. It was 12:59 a.m. They dropped Chris off and returned to Rainbow Village, stopping to give Greg Kniffin a ride from University Avenue. They continued to drink together for 15 or 20 minutes. Then Jim said he was tired, Mary and Greg left, and defendant went back to his car to drop off his pint of Wild Turkey. At that time, defendant decided to go to Ledger's Liquors to buy some beer. Walking out past the village, he saw Vivian Cercy's car pointed north along the roadside. He also saw Mary and Greg near the concrete docks. Greg

called him over to ask him if he had any matches. Defendant gave them some wooden matches in a leather-like pouch with a beaded design of deer mating, which defendant called "Peruvian love beads." They asked him if he had any marijuana. Defendant said he did and took out a wooden pipe in which they all smoked the marijuana. They also drank some beer. Defendant told Wolke he also had a corncob pipe with a broken stem and must have left it behind for Mary and Greg or else lost it where they were. While defendant was with them, Vince Johnson passed by on his way to Rainbow Village and said hello. Defendant spent a total of less than 10 minutes with Mary and Greg before proceeding to Ledger's Liquors. Finding the store closed, he returned to the village. He got his jacket and $20 from his car and noticed that Tracy Scarborough was still sleeping in the front seat. Defendant then walked to various locations in an unsuccessful effort to purchase marijuana. He did not see Mary and Greg on his way. He then returned to Rainbow Village, removed his jacket, got his laundry from his car, and walked to the laundromat at University and San Pablo Avenues. It was about daybreak when he got his laundry out of the car. Asked what time it was when he got to the laundromat and began to do his laundry, defendant said it was after 6 a.m. Wolke asked if he knew when the laundromat opened; defendant said it opened at 7 a.m., so he must have done his laundry after 7 a.m. While doing his laundry, defendant went across the street to a bakery and got some coffee. Defendant also said he ran into a man named Claude Roseman, who lived at the UC Hotel, and lent Claude a dollar.

On his return to the village, defendant stopped by the landfill office and noticed several people there. He then went to his car, opened the rear door, and noticed that his rifle was missing from its case, along with a white Tupperware container that had approximately eleven .44 magnum shells in it.[7] Defendant told David Bergman of the apparent theft; Bergman advised him to notify the police.

Wolke told defendant that the police could not figure out the motive for the murders. Defendant said he could think of plenty of reasons why somebody would want to murder the victims. Wolke said, "Why don't you tell me one?" Defendant paused, then said he could not think of any at the time. Wolke asked if he would be willing to take a polygraph test regarding his missing rifle. Defendant said he would have to think about it and get some legal advice.

### k. *Physical and other evidence.*

Inspector Wolke testified that on August 16, he examined a sandpile north of where Mary's body was found and adjacent to the spot where Greg's body

---

[7]During his August 17 interview, defendant had told Wolke that the thief had taken the ammunition but left the Tupperware case.

was recovered. He observed two sets of drag marks in the sand and blood-stains on some rocks near the water. Detective Eihl testified to the same observations. A corncob pipe with a broken stem was recovered from the area. Near a road grader parked to the west of the sandpile, Wolke found a "fist-sized" pool of dried blood buried an inch or two below the surface of the ground. The grader was spattered with blood. The next day, a small silver watch was recovered nearby. On August 18, officers, using bloodhounds, began an intensive search for the exact location of the shootings. Near the grader, officers found five teeth and a portion of an upper jaw.

Defendant was arrested for the murders on August 26, 1985. That same day, police searched defendant's car pursuant to a warrant and seized Levi's and a blue shirt thought to have been worn by defendant on the night of the crimes, a pair of boots, and camouflage pants. Chemical testing failed to reveal the presence of bloodstains on any of these items. Police also seized a leather gun case, empty .44 magnum casings, a white Tupperware container holding wooden matches, some gun oil and a gun cleaning case, and papers with references to firearms and weapons and various other subjects. The police searched for, but were unable to find, defendant's rifle, the serape or poncho that Greg was wearing when he was last seen alive, the pouch decorated with Peruvian love beads, and other items belonging to Greg and Mary.

### 1. *Testimony casting doubt on defendant's alibi.*

Jim Prew testified that he left Rainbow Village about 9:15 a.m. on August 16. Shortly thereafter, he saw defendant near the intersection of Marina Boulevard and University Avenue. Prew did not notice that defendant was carrying anything. (Defendant told Wolke he was doing his laundry on the morning of August 16.)

### 2. *Defense.*

Vivian Cercy testified for the defense at the preliminary hearing. As she was unavailable at trial, her prior testimony was read to the jury. Her testimony, which obviously was disbelieved by the jury, suggested that a third person, a blond man, was responsible for the murders.

Cercy, who was Harry Shorman's girlfriend, testified that she was in the vicinity of Rainbow Village on August 15 and 16, 1985. She and her two young daughters had no permanent address. Cercy drove a 1973 Dodge. On the night of August 15, she was parked outside the gates of Rainbow Village.

About 1:30 a.m. on the morning of August 16, Cercy moved her car to a dumpster across a parking lot from the village gates in order to remove trash

from the car. She got out of the car and walked to the dumpster. She saw a woman and two men standing near an orange and red van. The woman, who seemed upset, resembled Mary Gioia. One of the men, who had dark hair and a beard, resembled Greg Kniffin. The other man, whom Cercy did not know, was blond and almost six feet tall. The blond man held an object in his hand and asked, "Do you think she's seen anything?" The dark-haired man replied, "No, she couldn't have." They placed the object (which looked like a long stick) against the side of the car. Cercy testified that the stick could have been a rifle, but at the time she did not think of it as such. The woman said to the blond man, "You have to give it back." He replied, "This could mean money to us, we need this." The woman said, "I don't want any part of this, I'm going."

The woman began to walk down the hill and passed Cercy's car. Cercy invited the woman to stay the night in her car with her and her two daughters. The woman refused, saying, "No, I'll be all right."

The woman continued down the driveway. The blond man told the dark-haired man, "I'll take care of this." He walked down the roadway.

Cercy drove back to her parking spot and prepared her children to go to sleep. About 15 minutes later, Cercy heard three noises that sounded like firecrackers.

Somewhat later, Cercy saw a man resembling the blond man coming up the road. An hour and a half later, Cercy saw the man resembling the blond man walk up the waterfront, wiping his hands on the vegetation growing there. Then he either put something into, or took something out of, his backpack, and walked toward the village.

Cercy drove up the hill. Just outside the gates of the Rainbow Village compound, she saw the blond man again. He was washing his hands and his hair in a sink. She saw him throw something over the fence and heard it make a noise like a tin can when it struck the ground. Cercy turned around and drove down the hill again.

About 4 a.m., a man knocked on the window of Cercy's car. She could not describe him except to say that he was wearing a pea coat. The man asked her a series of questions and said he was going to kill her. Cercy remained there until about 5 or 5:30 a.m., when she gave a village resident named Anthony a ride to work.

### 3. *Rebuttal.*

Inspector Wolke testified that he interviewed Vivian Cercy on August 17 after Harry Shorman introduced him to her. She told Wolke that she had had

quite a bit to drink on the night of the 15th. She did not mention seeing a rifle, but said that, while overhearing the conversation that she reported, she saw a person stick a 10- or 12-inch object down his waistband. She was positive it was not a rifle. She did not tell Wolke that someone had threatened to kill her.

Vincent Johnson testified that, in September or October, he had a conversation with Cercy in which she said she had not seen anything on the night of the murders, but was speaking out because Harry told her to do so.

### B. *Issues.*

#### 1. *Sufficiency of evidence.*

■ Defendant contends that the evidence adduced by the prosecution was insufficient as a matter of law either to support the convictions or to establish that he premeditated the murder of Gregory Kniffin. ■ On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].) In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. (*People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*People* v. *Bean, supra,* 46 Cal.3d at pp. 932-933, internal quotation marks omitted.) " 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " (*Id.* at p. 933 [quoting *People* v. *Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91].)

■ The jury in this case heard evidence tending to show that defendant had the opportunity and the means to commit the murders. Defendant,

looking "grim," was with Mary and Greg when they were last seen alive, near the landfill office outside the Rainbow Village compound, during the early hours of August 16, 1985. A corncob pipe with a broken stem was found near the spot where police found blood and drag marks, not where defendant claimed to have smoked marijuana with the victims using such a pipe. Defendant was in possession of a .44 magnum rifle and ammunition at sunset on August 15th, when he fired a shot at Harry Shorman's flag. The following morning, he reported that the rifle had been stolen. He asked Thomas Medlin to hide his ammunition, but told police that the cartridges had been stolen along with the rifle. From the fact that defendant was trying to hide his ammunition after the murders, the jury could reasonably infer that he had possession of the rifle when Mary and Greg were killed and later disposed of it. Expert opinion established that Mary's fatal wound was of a kind normally inflicted by a high-powered rifle such as the .44 magnum.

Greg was killed by a massive contact gunshot wound to the neck, pictures of which were shown to the jury. Defendant urges that because no expert gave an opinion as to the type of weapon that wounded Greg, the jury could not rationally conclude that defendant's rifle killed both victims. We disagree. "[W]hat the pathologist can say from a laboratory examination is more limited than what a reasonable trier of fact may find beyond any reasonable doubt, after considering the evidence as a whole." (*People* v. *Chambers* (1982) 136 Cal.App.3d 444, 455 [186 Cal.Rptr. 306].) The bodies of both victims bore similar wounds and were disposed of in the same manner within the same time span. From these facts the jury reasonably could believe that the same weapon killed both Mary and Greg.

Other circumstantial evidence is indicative of defendant's consciousness of his guilt. Calvin Wylie testified that about 6:30 a.m. on August 16, he saw defendant in the general area of the homicides, bending over what appeared to be garbage bags. When the police recovery team was beginning to lift the body of one of the victims from the water, before a face or clothing could be seen, defendant—standing about 45 feet away—commented, "That's Mary." Officer Eihl, present at the scene and closer to the body than was defendant, could not then tell whether the victim was male or female. The jury could have reasoned that only Mary's killer would have been able to identify her at that moment. Defendant gave an apparently false reason for stopping to talk with the victims at the landfill office: he said they asked him for a match, and told Wolke he gave the victims a beaded pouch containing wooden matches, but a waterlogged book of matches was recovered from Mary's clothing. Defendant provided inconsistent descriptions of his activities on the night of the killings. From this the jury could infer that he was lying to conceal his guilt. When Officer Wolke told defendant that the police could

not figure out any motive for the murders, defendant replied that he could think of plenty of reasons. Wolke asked defendant to name one; he said he could not think of any at that time. Defendant's statement hinted that he himself had a motive or motives for the murders. Defendant lied to the police about how he had acquired his rifle. He told Scarborough he thought he would be in trouble because his rifle was missing and was worried that his gun had been used to shoot both victims.

Defendant compares the evidence adduced against him with that held insufficient to support a murder conviction in *People* v. *Blakeslee* (1969) 2 Cal.App.3d 831 [82 Cal.Rptr. 839]. When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts. (*People* v. *Chambers, supra,* 136 Cal.App.3d at p. 455.) However, we address the *Blakeslee* case because defendant places heavy reliance on it. In *Blakeslee,* proof of guilt consisted principally of evidence of opportunity and motive, together with a false alibi indicating consciousness of guilt. The court reversed Teresa Blakeslee's conviction because the evidence was insubstantial in light of what was *not* proven, principally the prosecution's failure to produce the murder weapon or to link a specific weapon with the crime, and because the evidence could plausibly be interpreted as consistent with the guilt of the defendant's brother. The *Blakeslee* court discounted the false alibi as evidence of consciousness of guilt, finding it to be of less than solid value because the defendant plausibly explained why she lied (i.e., she wanted to protect her brother). (*People* v. *Blakeslee, supra,* 2 Cal.App.3d at p. 839.) In contrast, the many inconsistencies in defendant's statements are not so easily resolved. No plausible explanation for them appears, apart from defendant's wish to shift suspicion away from himself. Comparison of the evidence in this case with that in *Blakeslee,* for whatever such a comparison is worth, thus fails to reveal any deficiency of proof warranting reversal.

■ Defendant urges that the verdict of first degree murder for the killing of Greg Kniffin be reversed for want of sufficient evidence of premeditation and deliberation. He relies on the discussion contained in *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P. 2d 942], and cited in many subsequent cases. (See, e.g., *People* v. *Hernandez* (1988) 47 Cal.3d 315, 349-350 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 347-348 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 849, fn. 1 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 749-750 [175 Cal.Rptr. 738, 631 P.2d 446].) ■ We said in *Anderson* that "[t]he type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what

defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (70 Cal.2d at pp. 26-27.)

Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 869-870 [277 Cal.Rptr. 122, 802 P.2d 906].) *Anderson* identifies categories of evidence relevant to premeditation and deliberation that we "typically" find sufficient to sustain convictions for first degree murder. (*People* v. *Anderson, supra*, 70 Cal.2d at p. 27.) Using the *Anderson* analysis as a guide, we examine the evidence of premeditation in this case.

 Circumstantial evidence suggestive of planning activity is present in this record. Vince Johnson testified that he saw defendant with the victims about 2:30 a.m. on August 16 near the landfill office, but did not mention seeing defendant's rifle. The jury could infer that defendant returned to his car to get the rifle and ammunition before committing the murders. Defendant's .44 magnum rifle lacked a clip; in order to fire a second shot, one had to eject the expended case by opening the bolt and handload a round into the chamber. In fact, the breech of defendant's rifle was recessed and rounds were liable to jam if not properly inserted. These facts suggest planning in the loading and reloading of the rifle.[8] Planning may also be inferred from the fact that the murders occurred in a location outside Rainbow Village,

---

[8]Defendant attacks this theory of planning activity, arguing that expert testimony did not establish that the same weapon killed both Greg and Mary, and hence that the record does not

where a weapon would not have been readily accessible, and at an hour when activity would not normally be taking place. (Compare *People* v. *Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126].)

The manner of the killings strongly suggests premeditation. Both victims were killed by single contact shots, to Mary's head and Greg's neck, a method sufficiently " 'particular and exacting' " to warrant an inference that defendant was acting according to a preconceived design. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1050 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Bloyd*, *supra*, 43 Cal.3d at p. 348.) The beatings defendant inflicted on both victims before he shot them, while suggestive of rage, do not preclude an inference of premeditation. " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 [162 Cal.Rptr. 306, 606 P.2d 341], vacated on other grounds and remanded (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042]; see also *People* v. *Wharton* (1991) 53 Cal.3d 522, 547 [280 Cal.Rptr. 631, 809 P.2d 290].)

Defendant contends that the prosecution adduced no facts of type (2), showing a prior relationship and/or conduct with the victims from which the jury could infer that he had a motive to kill them. At trial, the prosecutor argued that the condition of Mary's clothes when her body was recovered—her outer garment having been unbuttoned and partially unzipped—indicated a possible sexual motive. Defendant denies that this evidence supports an inference of sexual motive, noting that there was no evidence of sexual trauma and that at sentencing the trial court declared the murders to have been committed "without apparent motive, nor any rhyme or reason." He also speculates that the condition of Mary's garments was traceable to the fact that her body was dragged over rough ground and had floated in the bay for hours after her death.

We need not decide whether the inference that defendant intended a sexual attack on Mary alone would demonstrate a motive for murder. The jury could also have found a " 'plausible motive' " for Greg's murder in defendant's need to eliminate a witness to his crimes. (See *People* v. *Lucero* (1988)

<hr />

support the inference that defendant reloaded the rifle. Because we have concluded that the jury could reasonably infer that defendant's .44 magnum rifle killed both victims, we reject this argument.

Justice Mosk, in dissent, argues that the fact that defendant's rifle required manual reloading provides minimal support for an inference of premeditation, asserting that because defendant was familiar with the rifle, he could manipulate it "by reflex action." We are aware of no evidence supporting that assertion. Moreover, the sequence of acts occurring here—ejecting an expended case, grasping a bullet and drawing it out of a pocket or other container, and pushing it into place in the rifle's chamber, all under cover of night—hardly involves the sort of involuntary, instinctive, or unlearned response that may properly be called a reflex.

44 Cal.3d 1006, 1019 [245 Cal.Rptr. 185, 750 P.2d 1342]; *People* v. *Alcala, supra,* 36 Cal.3d at p. 627.) Defendant urges that this theory of motive is impermissible due to the lack of evidence as to which victim was killed first. His contention is illogical. There is no evidence that both victims were not present together at the time of the murders. The jury could conclude that defendant deliberately and premeditatedly killed Greg because he either had witnessed, or was otherwise about to witness, Mary's murder. ■ In any event, "[w]e have never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder. A senseless, random, but premeditated, killing supports a verdict of first degree murder." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 814 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

■ We are satisfied that the evidence reasonably justified the jury's conclusion that defendant formed and acted on a deliberate plan to kill. Defendant's conviction does not, therefore, violate his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the federal Constitution.

### 2. *Evidentiary issues.*

#### a. *Admission of testimony regarding "stalking" game.*

■ Defendant contends that the trial court erred in admitting testimony that defendant claimed to enjoy sneaking up on people. The trial court permitted Tracy Scarborough and Thomas Medlin to testify that, months before the killings, defendant told them he liked to play a game that he called "stalk." The object of the game was to sneak up on people and then sneak away without their ever being aware of his presence. The court rejected defense counsel's hearsay and relevancy objections, ruling that under Evidence Code section 352, the probative value of the testimony was not outweighed by undue prejudice.[9] The court reasoned that the testimony might have some relevance in a case "where we have a darkened night area," where there was contact between the killer and the victims and "we don't know how it came about . . . ." The court also observed that "there was not any weapon involved, and he says he sneaks up on them and not hurt them, and it is a game playing of some sort, and nothing more than that."

The trial court did not abuse its discretion in admitting the "stalk" evidence. It was relevant, having some tendency in reason to show how

---

[9]To minimize any prejudice, the trial court ordered Scarborough to omit from his testimony any reference to the fact that defendant played "stalk" with a bayonet. He and Medlin complied with this prohibition.

defendant, having previously been seen talking with the victims, could later have come upon them unawares with his rifle. In his insistence that the testimony was irrelevant absent some showing that the killer in fact did sneak up on the victims, defendant takes too narrow a view of the concept of relevancy. Defendant contends that the "sexual motive" theory militates against an inference of a stealthy approach. He also argues that the evidence of premortem beatings tends to establish that the perpetrator did not come upon the victims by stealth, since in such a scenario he could have shot at least one of his victims at close range before the victims were aware of his presence and without risking a physical confrontation. These arguments, while not irrational, are not the only plausible ones supported by the evidence; they fall short of negating the relevance of defendant's ability to sneak up on people. Furthermore, since the "stalk" testimony did not reflect any violent propensities, the trial court could properly conclude that its probative value outweighed any prejudice. (Evid. Code, § 352.)

■ Defendant also argues that the "stalk" testimony showed only that he had a disposition to play at sneaking up on people, and thus was character evidence inadmissible under Evidence Code section 1101, subdivision (a). He did not urge this ground at trial, so it is waived. (*People v. Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330].) Were we to reach the merits, we would conclude that his point is not well taken. The "stalk" evidence demonstrated that defendant had the ability to surprise the victims. (Evid. Code, § 1101, subd. (b) [no bar to admission of other-act evidence when relevant to prove some fact other than disposition to commit such an act].) The manner in which the killer came into contact with the victims was unknown; that defendant was capable of doing so without their awareness was certainly relevant to show opportunity. Admission of the evidence was proper under Evidence Code section 1101, subdivision (b).

### b. *Writings concerning firearms.*

The search of defendant's Rainbow Village space and his automobile yielded, among other things, a number of notebooks and sheets of paper containing handwritten references to various firearms and weapons, and a pamphlet entitled "Tips for Shooters." During trial, defense counsel sought to exclude testimony by Detective Wolke regarding those items, arguing they were irrelevant to any disputed issue and unduly prejudicial. The trial court overruled the defense objection, reasoning that the items "did tend to show a preoccupation with weapons and that would be some evidence that he would be very unlikely to not have reported [the theft of his rifle] to the police if, in fact, it had been stolen . . . ." The court weighed the evidence under section 352 of the Evidence Code and concluded there "certainly wouldn't

be any problem of any undue consumption of time nor of any confusing the issues or misleading the jury. I don't see any undue prejudice. I think it has some relevance, and the district attorney's offer is to the preoccupation and why he did not report it." Following this ruling, Wolke testified regarding the gun-related items found in the search. On cross-examination, Wolke acknowledged finding other written materials in defendant's car, including floor plans to a house or bus, specifications of various automobiles and trucks, and lists of camping gear, movie titles, and blues and jazz recordings.

█ Defendant contends that Wolke's testimony had no relevance to any disputed issue and so was inadmissible under Evidence Code sections 210 and 350.[10] Even if it had some marginal relevance, defendant argues, that relevance was outweighed by the potential for prejudice. We disagree. As the trial court found, the evidence tended to show that defendant had a strong interest in firearms, which in turn had some tendency to show that had his rifle been stolen, as he claimed, he likely would have reported the theft to the police at the earliest opportunity. The truthfulness of his claim of theft was obviously a disputed fact of consequence to the determination of the case. (Evid. Code, § 210.) Defendant contends that because, by August 17, he had informally mentioned the theft of the rifle to numerous Rainbow Village residents as well as to Wolke, his failure to make an official report of the theft until August 20 did not tend to prove that his claim of theft was false. We do not agree. A jury might consider the difference between merely mentioning the theft to neighbors or to a police investigator during an on-scene interview, on one hand, and going to the police station to make a formal report, on the other, as bearing significantly on the truth of the claim.

Defendant labels the prosecution's theory of relevancy "disingenuous" and "a false and artificial construction." He contends that the reason he was initially loathe to report the theft of his rifle was that he is an ex-felon and he believed it was illegal for an ex-felon to possess such a weapon, and that the trial court well knew this was the case; therefore, he urges, it was unfair to allow the prosecutor to use his failure to make a prompt report to discredit his claim of theft. But defendant did not raise this argument in support of his motion to exclude the evidence. Moreover, the trial court could reasonably conclude that defendant's mistaken belief as to his liability for possession of the rifle did not negate the relevancy of his failure to make a prompt official report, since he had spoken informally to village residents and to Wolke

---

[10]Evidence Code section 210 provides as follows: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence."

about the alleged theft before he learned that ex-felons are permitted to own rifles.

Even if the inference that defendant's interest in firearms would have led him to report the theft was too tenuous to support a determination of relevancy under Evidence Code section 210, the firearm evidence carried no potential for prejudice. First, the jury already knew that defendant owned a powerful rifle. Second, an interest in firearms—one shared by many law-abiding citizens—does not necessarily imply a violent character. Thus, even if admission of the evidence was error, reversal is unwarranted.[11]

### c. Testimony and identification by victims' parents of premortem photographs.

At the beginning of the guilt phase, Patricia Gioia and David Kniffin, Mary's mother and Greg's father respectively, testified briefly as to how the victims came to be in California. In the course of their testimony, each identified a photograph of his or her child, taken in life, which was admitted into evidence.

Before Mrs. Gioia and Mr. Kniffin took the stand, defense counsel objected to admission of their testimony. He contended it was irrelevant because the victims' identities were not disputed and the reasons why they were at Rainbow Village were immaterial. He also urged that the testimony was apt to excite the jury's passions, sympathy, and emotion, and thus was potentially prejudicial. The trial court overruled his objections, concluding in essence that the testimony was relevant to identify the victims, differentiate them from other Rainbow Village residents, and establish why they were there. The court also noted that the parents would not be permitted to answer questions evoking sympathy. Defendant contends the court erred, denying him his due process right to a fair trial.

---

[11]Defendant raises again in this context his claim of error, prejudice, and denial of due process in the admission of the "stalk" evidence. Having found no error in the admission of either the "stalk" testimony or the evidence of defendant's interest in firearms, we decline to find error in their combined admission. In any event, admission of the challenged evidence was harmless under any standard in light of the testimony that defendant had engaged in target practice and had fired a shot in the direction of an inhabited vehicle a few hours before the murders.

Defendant also complains that evidence of his interest in firearms reflected his choice of reading materials and its admission therefore implicated his First Amendment rights under the federal Constitution. He cites *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776], in which we noted that "trial courts should exercise great caution before admitting evidence of a defendant's private reading material, especially where the relevance of such material to the issues in the case is slight." (*Id.* at p. 576.) Defendant did not raise this issue at trial, so we do not consider it. (Evid. Code, § 353.)

Testimony regarding how the victims came to be staying in Rainbow Village helped to complete a picture of the circumstances of the crimes. Defense counsel's comment that identity was not in dispute did not obviate the need to present such a picture to the jury. Additionally, the fact that the victims were transient visitors rather than long-term residents of Rainbow Village was significant in connection with the evidence that defendant was able to identify Mary Gioia's body before it was pulled from the water. The testimony was, therefore, properly admitted. Defendant contends that certain details provided by the parents (that Mary was a talented baker, that her mother was reading Mary's last letter when the police called to inform her of Mary's death, that Greg had been depressed by his parents' divorce) could only serve as an emotional appeal. We agree that those details could not properly add to the jury's image of the circumstances of the crime, but are unpersuaded that the brief, spontaneous remarks defendant cites could have prejudiced him. Nor can we say that the defendant was prejudiced by the prosecutor's mere reference, in closing argument, to the fact that Patricia Gioia and David Kniffin had testified regarding their children's backgrounds.

Similarly, admission of the premortem photographs of Mary and Greg could not, we believe, have prejudiced defendant in any way. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 974 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Kimble* (1988) 44 Cal.3d 480, 499 [244 Cal.Rptr. 148, 749 P.2d 803].) They appear to be eight- by ten-inch enlargements of ordinary color snapshots, not particularly calculated to elicit sympathy (*People* v. *Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37]) and unlikely to have made an emotional impact on the jury over and above that unavoidably present in a capital murder prosecution. Despite the circumstantial nature of the evidence, this case is not so close that admission of the photographs tainted the trial with unfairness.

### d. *Admission of post mortem slides and photographs, teeth, and bone fragments.*

Over defense counsel's objection, the trial court admitted into evidence various color photographs and slides depicting the condition of Mary's and Greg's bodies and their wounds. The trial court also allowed in evidence, over objection, fragments of bone and teeth, presumably from Mary's body, found at the crime scene. ■ Defendant contends this evidence was highly inflammatory and cumulative to other evidence establishing the same facts. Its prejudicial effect therefore substantially outweighed its probative value, he contends, and its admission constituted an abuse of discretion under Evidence Code section 352. Defendant claims also that admission of

the evidence violated his due process rights under the federal Constitution. We find neither abuse of discretion nor deprivation of due process.

Defendant does not contest the relevancy of the photographs and slides. Clearly, they served to clarify Dr. Iocco's testimony regarding the nature and location of the wounds. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 776 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 365 [105 Cal.Rptr. 138, 503 P.2d 594].) Moreover, they tended to show that the murder weapon could have been a high-powered rifle. Their depictions of the press contact wounds were also relevant to premeditation. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1028 [251 Cal.Rptr. 643, 761 P.2d 103].) Defendant complains that the trial court did not expressly state that the evidence was "necessary" to enable the jury to understand the pathologist's testimony. He cites no authority that would require such a statement. Contrary to what defendant asserts, the fact that the defense did not contradict the testimony of either Inspector Richardson or Dr. Iocco did not make the photographs and slides superfluous or merely cumulative. Thus, the evidence possessed considerable probative value.

Although some of the photographs and slides—which we have viewed—were gruesome and extremely unpleasant, the trial court reasonably concluded that their potential prejudice did not outweigh their probative value. Moreover, the transcript of the hearing on defense counsel's objections to the photographs reveals that the trial court took care to exclude duplicative pictures, and so, we infer, was aware of its duty to exclude cumulative evidence. We find no abuse of discretion in admission of the photographs, and consequently no denial of due process.

We likewise find no error in the admission of the teeth and bone fragments. In addition to corroborating the testimony of Alvin Parker and Inspector Wolke that this evidence was found at the crime scene, the admission of the fragments clarified the testimony of Dr. Iocco. Although this type of evidence is grim and shocking, it is not for that reason alone subject to exclusion. (*Dutton* v. *State* (Del. 1982) 452 A.2d 127, 138-139 [bones not inadmissible per se, although shocking and gruesome; portions of homicide victim's vertebrae properly admitted]; see also *State* v. *Sexton* (Tenn.Crim.App. 1986) 724 S.W.2d 371, 373-374 [skull fragments of homicide victim properly admitted, although cause of death stipulated, as relevant to nature and type of injury suffered by victim as well as to show "lead splatters" on skull consistent with infliction of wound by high-powered rifle]; *State* v. *Eason* (1991) 328 N.C. 409 [402 S.E.2d 809, 814-815] [finger of victim killed in arson fire properly admitted, as print match proved identity].)

### 3. *Prosecutorial misconduct.*

#### a. *Argument regarding firearms expert's testimony.*

 Defendant argues that in four instances the prosecutor improperly argued that the testimony of Inspector Richardson, the prosecution's firearms expert, established that both victims were killed with a high-powered rifle. No expert gave an opinion as to the type of weapon that inflicted Greg's fatal wound. We reproduce in the margin relevant portions of the challenged argument.[12]

---

[12]"[The Prosecutor:] Inspector Richardson was called to the stand. He was a firearms expert, some 35 years in law enforcement, and as you know now from the ballistics of a .44 Magnum rifle it had to be a rifle which produced those gruesome wounds to both victims. A handgun simply has not got that power to do such."

"First off, we know that both victims were murdered by a large caliber rifle if you believe the testimony of Inspector Richardson, the 35 year firearms expert who has been in law enforcement that long. Is there any doubt in your mind that a rifle was not the murder weapon? You look at the ballistics, and I believe he said it was something like 741 foot pounds at the muzzle and that is sufficient to cause the explosive force.

"And you got some of the explosion testimony from Doctor Iocco which produced the gruesome injuries to both victims. Do you really have any other explanation that it was a rifle? It certainly wasn't a .22, that was for sure. What do we know if we have both victims murdered by a rifle?"

"People's number 26-C is a picture showing the bore or the muzzle of that particular weapon. Take a look at the picture of Mary Gioia and her entry wound and I think you will understand that not only have we proven that it was at least a weapon capable of bringing down a deer legally in California, a large caliber deer rifle, but it was also a press contact wound. And obviously it had to be a rifle due to the explosion on the respective face and neck area of both victims."

"Now, we know from the testimony of Doctor Iocco that not only were the victims murdered with a press contact wound by a high powered rifle, further testimony by Inspector Richardson which caused a tremendous explosion, they were savagely beaten before they were murdered."

"Here is one of the typical defense arguments concerning the prosecution witness, and it concerned Inspector Richardson. First of all, Inspector Richardson's testimony, according to Mr. Chaffee [defense counsel], doesn't prove it was a rifle which produced the injuries.

However, but, if you feel that it does—and there's no way you shouldn't, because his testimony is uncontroverted—it doesn't prove it was defendant's rifle which murdered the victims. But if you think it was defendant's rifle that was used to murder the victims, it doesn't prove that defendant pulled the trigger.

"That analogy is correct. First of all, they're not even conceding it is a rifle. Second, if you think it is a rifle, it may be defendant's rifle. And if you do believe it is the defendant's, it doesn't prove that Ralph International Thomas pulled the trigger. That's true. But the bottom line is Richardson wasn't called to court to testify that the defendant pulled the trigger. He was an expert witness that testified it was a high powered rifle that produced the massive injuries on Greg Kniffin and Mary Gioia that you will see later on and that is it. He was not offered to prove guilt or innocence. It is not that we say we are trying to prove the guilt through an expert witness saying the injuries could only be produced by a rifle."

Our reading of the argument persuades us that the prosecutor did not engage in misconduct by mischaracterizing Richardson's testimony. All but one of the challenged comments are in actuality inferences from Richardson's testimony and the explosive nature of the fatal wounds. As such, they are within the range of permissible argument. ▬▬ "[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], overruled on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 33-34 [164 Cal.Rptr. 1, 609 P.2d 468].) ▬▬ The prosecutor explicitly acknowledged that the defense was disputing whether Richardson's testimony proved that a rifle killed both victims. Moreover, at the outset of both the initial and final phases of his closing argument, the prosecutor emphasized that statements of counsel are not evidence, and the court so instructed the jury both at the start of the trial and just prior to deliberations. We do not believe the jury could have been confused by the prosecutor's inferences.

In only one instance did the prosecutor state unequivocally that Richardson testified that a rifle killed both victims. Taken in context as an attempt to counter defense counsel's argument that the murder weapon was not a rifle, the remark does not appear to have been intended to deceive. (See *People* v. *Haskett*, *supra*, 30 Cal.3d 841, 866.) We do not believe that the jury, repeatedly having been advised that statements of counsel are not evidence, would have been misled. If this isolated remark can be held to be misconduct (see *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396]), it is not of constitutional magnitude and does not warrant reversal.

### b. *Sexual motive inference.*

▬▬ Next, defendant complains that the prosecutor engaged in misconduct by inviting the jury to speculate, without supporting evidence, that Mary's murder was sexually motivated. Noting that the fastener and zipper of Mary's shorts were undone, the prosecutor argued that the state of her clothing suggested she was beaten and murdered for resisting defendant's sexual advances. Relying on *People* v. *Craig* (1957) 49 Cal.2d 313 [316 P.2d 947], *People* v. *Granados* (1957) 49 Cal.2d 490 [319 P.2d 346], and *People* v. *Guerrero* (1976) 16 Cal.3d 719 [129 Cal.Rptr. 166, 548 P.2d 366], defendant urges that this evidence was insufficient to permit such an inference. Those cases do not assist him.

In *Craig*, this court considered whether the evidence supported a theory of first degree felony murder perpetrated in the commission or attempted commission of a rape. (*People* v. *Craig*, *supra*, 49 Cal.2d at p. 318.) The body of the victim was found lying under a car, legs spread slightly apart, clothed in a raincoat over a nightgown (or slip) and panties. Each of those garments had been torn open, exposing the front of the body. (*Id.* at p. 316.) We concluded that this and certain other evidence did not suffice to prove that the killing was committed in the attempt to commit rape or in the commission of rape. (*Id.* at p. 319.) Similarly, in *People* v. *Granados*, *supra*, 49 Cal.2d 490, in which the body of the 13-year-old victim was found with her clothing in disarray, we held that the evidence failed to support a conviction for first degree felony murder committed in the perpetration or attempted perpetration of a violation of section 288. (*Id.* at p. 497.) The holdings in *Craig* and *Granados* reflect the prosecution's high burden of proof of each element of any charged offense. *People* v. *Guerrero*, *supra*, 16 Cal.3d 719, dealt with whether evidence of an earlier uncharged rape could be introduced in a murder prosecution to prove identity and intent. (*Id.* at p. 722.) We concluded that the proffered testimony was irrelevant and cumulative on the issue of identity, and that the lack of evidence of sexual activity between the defendant and the murder victim rendered the rape testimony likewise inadmissible to show intent. (*Id.* at pp. 725-727.) None of the cases defendant cites, therefore, is relevant to the issue here: whether the requested inference of some possible sexual motive found some basis in the evidence, or was instead based on mere suspicion, imagination, speculation, surmise, conjecture, or guesswork. (*People* v. *Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843].) Although we find the inference far from compelling, the prosecutor's comments did not constitute misconduct. Indeed, in *People* v. *Granados*, *supra*, 49 Cal.2d 490, we rejected a claim of misconduct in the prosecutor's argument asking the jury to infer that the murder occurred in the course of committing or attempting to commit a violation of section 288, holding that the trial court properly left to the jury the determination whether the requested inference was reasonable. (49 Cal.2d at p. 495.) Defendant complains that the facts in *Granados* more substantially supported an inference of sexual motivation than do the facts in this case. We agree, but remain persuaded that the prosecutor's comments here had a sufficient evidentiary basis.

c. *Argument regarding "stalking" evidence.*

In closing argument, the prosecutor reminded the jury of the "stalk" testimony and urged them to infer that defendant, a person used to sneaking up on people without their knowledge, got close to the victims in that way. Defendant urges that because the evidence did not establish that

■■■■■■■■■

he or anyone else "stalked" the victims, the prosecutor's argument compounded the trial court's earlier error in admitting the testimony. We disagree. As we have concluded, the testimony was properly admitted and the prosecutor was entitled to invite the jury to draw the desired inference. Defendant complains that the prosecutor conjured up an image of a ferocious and evil nightstalker in an effort to strike terror in the jurors' hearts. We search the record in vain for any such inflammatory rhetoric.[13]

### d. *Attacks on Cercy's credibility.*

■■■■ Defendant argues that the prosecutor resorted to an inappropriate tactic to destroy the credibility of defense witness Vivian Cercy. Cercy's testimony, if believed, pointed to an unknown third person as the murderer. Vincent Johnson, however, testified that Cercy told him she had seen nothing on the night of the murders, but lied at the request of her boyfriend, Harry Shorman. Cercy denied asking Shorman to ask the police for protection, but admitted that he once mentioned it to them in her presence. She also testified that Shorman wanted her to stay with him in his bus at Rainbow Village, but that she was unwilling to do so, having two small children. The prosecutor argued that Cercy's testimony was invented in order to make her a material witness, so that she would be kept at state expense in the vicinity for Shorman's convenience. Defendant asserts that this argument represented mere speculation. We disagree. The inference was logically sound, given Johnson's and Cercy's testimony.

---

[13]The relevant portions of the prosecutor's final arguments are as follows:

"Ask yourself this, how could someone get close to the two victims without their seeing that person with a rifle, huh? How could somebody have a rifle, and get close to those two people without being seen? Remember the words of Thomas Medlin and Tracy Scarborough. What was a favorite game of the defendant: stalk. Mr. Chaffee [defense counsel] didn't think that was anything too important, kind of wipe that one away from the evidence because he doesn't think that is important.

"Well, wouldn't that explain how the defendant, with a rifle, got close to them? Give me another reasonable explanation. Answer that.

"The two people are down there, and somebody comes up with a rifle, without them seeing or hearing it, how is that to be? How is that to be? Or is it somebody who is used to playing stalk and sneaking up on people without their knowing it?

"Now that is an inference to be drawn and that is a reasonable inference. Can you tell me any other? Search your mind, search all the intelligence you people have and tell me another inference you can draw from that, and I think you know the answer."

"Just as the possibility of the absent big brother setting up the younger kid is unreasonable, so is the defense argument that a stranger broke into the defendant's car and stole only the rifle and not the case and ammunition and just happened to have two rounds with him when went [*sic*] down and murdered Mary and Greg, and happened to be two rounds of the correct ammunition and they knew how to hand load the gun because the clip was not there, and knew how to do it in the dark, and used it to murder Mary and Greg, after stalking them."

"Who else knew how to stalk people without their seeing him?"

 Defendant also labels as misconduct the prosecutor's remark that "It is a good thing you're out of town, [Cercy,] you would probably be charged with perjury." Defendant correctly points out the weight that the comments of the prosecutor, as the People's official representative, carry with the jury. (*People* v. *Talle* (1952) 111 Cal.App.2d 650, 677-678 [245 P.2d 633].) It is also true that the prosecutor may not interject a personal belief in the merits of the case, as opposed to a belief based on the evidence produced at trial. (*People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564]; *People* v. *Johnson* (1981) 121 Cal.App.3d 94, 102 [175 Cal.Rptr. 8].) However, as defendant also tacitly acknowledges, the prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial. (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 702 [248 Cal.Rptr. 69, 755 P.2d 253].) He may characterize testimony as perjurious if the evidence so warrants. "The words 'lie' and 'perjury' are the expressions commonly used to describe wilfully false testimony, and there is no reason why a prosecutor must resort to circumlocutions when discussing this distasteful but pertinent subject." (*People* v. *Garrison* (1966) 246 Cal.App.2d 343, 352 [54 Cal.Rptr. 731]; see also *People* v. *Ellis* (1966) 65 Cal.2d 529, 540 [55 Cal.Rptr. 385, 421 P.2d 393] [single reference to witness having perjured himself, based on analysis of evidence before jury, may be unobjectionable].) Defendant argues that by saying that if Cercy were in town she would be *charged* with perjury, the prosecutor went beyond expressing an opinion based on the evidence and placed the weight of his office behind his personal conclusion that Cercy had committed perjury. We are unpersuaded, and find no impropriety in the remark given the improbable nature of her testimony and the indications of her untruthfulness in the record.

Defendant also complains that the prosecutor engaged in misconduct in arguing that Vivian Cercy's testimony was "contrived." Specifically, he argues that the prosecutor twice implied that defense counsel was responsible for the contrived testimony.[14] This implication, defendant insists, unfairly impugned defense counsel's integrity. Although his attorney did not

---

[14]In one instance that defendant cites, the prosecutor argued that Cercy contrived her testimony that in the early hours of August 16, she saw a woman, whom she later learned was Mary Gioia, wearing a top of a light color. "No doubt in Cercey's [*sic*] mind that she had a light top on. [¶] Well, let's look when they pull her out of the water. What was not visible is the dark covering over the white blouse, right? Now do you think Mary Gioia was wearing this dark top covering in that fashion, pulled way up, when she was, quote at the dumpster arguing with these people? Come on. Come on, ladies and gentlemen. The only reason she knows it was a light top, because Harry Shorman told her. That's how the body was floating. But when the truth of the matter comes out. She's got a dark top on. Come on, Vivian. Come on, Vivian. It is a good thing you're out of town, you would probably be charged with perjury. There is no way, no way was she wearing a light top. She couldn't have seen it because that dark covering was there. [¶] Now, I suppose Mr. Chaffee [defense counsel] would have you

object, defendant contends that we should not deem appellate review waived. He contends that defense counsel always runs an excessive risk if he objects to prosecutorial argument criticizing him personally, since he will lose credibility if the court overrules the objection. We need not address this contention. Reading the prosecutor's closing argument as a whole, we find it sufficiently clear that the general thrust of the complained-of remarks was that Cercy testified as she did at the behest of her boyfriend, Harry Shorman, not that defense counsel concocted a story for Cercy to tell. To the extent of any ambiguity in the prosecutor's statements, we do not lightly infer that he intended them to have their most damaging meaning, or that the jury would draw that meaning from the other, less damaging interpretations available. (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 647 [40 L.Ed.2d 431, 439, 94 S.Ct. 1868].) Perhaps defense counsel's failure to object reflected his own perception that the prosecutor was referring to Shorman's influence on Cercy and not voicing a personal attack. In any event, we do not believe that the more questionable of the prosecutor's statements were so egregious as to deprive defendant of a fair trial. (*Id.* at pp. 642-643; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619].)

### 4. *Adequacy of trial counsel.*

Defendant contends his counsel was ineffective in (1) failing to object to instances of misconduct in the prosecutor's closing arguments and (2) failing to argue the insufficiency of the evidence to establish murder in the first degree.

■■ Familiar principles govern our review of this issue. The burden of proving a claim of inadequate trial assistance is on the appellant. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) He must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Additionally, he must establish prejudice, i.e., a reasonable probability that absent counsel's unprofessional errors the result would have been different, before he can obtain relief. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839]; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052].) " 'Because of the difficulties inherent in making the evaluation, a court must

---

think, just another little mistake. How many mistakes does the defense get to make before you realize perhaps they're contriving something?"

In the other instance that defendant cites, the prosecutor stated: "The defense has been contrived. The testimony of Vivian Cercey [*sic*] is ridiculous, at best, perjurious at worst."

On other occasions during his closing argument, the prosecutor said that Cercy's testimony was contrived, but these statements were made in a context that implicitly or explicitly referred to Harry Shorman's role in getting Cercy to testify.

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " (*People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892], quoting *Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at pp. 694-695].)

■ As to defendant's claim that his counsel should have objected to portions of the prosecutor's closing argument, we concluded above that the prosecutor did not engage in any prejudicial misconduct. It follows that defense counsel was not ineffective in making no objection. Even as to the one instance in which the prosecutor misstated Inspector Richardson's testimony and in the few instances in which the prosecutor's ambiguous comments might have been taken as an attack on defense counsel's integrity, the failure to object did not approach ineffectiveness. A mere failure to object to argument seldom establishes counsel's incompetence (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]); this case is no exception.

■ Defendant also faults defense counsel for not arguing more strenuously that defendant's rifle was not proven to be the murder weapon, but he establishes neither that the argument counsel did present fell below the objective standard of reasonableness nor that there is a reasonable probability of a different outcome had counsel made the argument defendant suggests.

■ As to defendant's contention that his counsel should have argued that the evidence was insufficient to support a finding of murder in the first degree, we likewise find no ineffective assistance of counsel. Consistent with the defense that defendant was not the killer, defense counsel in closing argument argued defendant's innocence and reasonable doubt. He emphasized gaps in the prosecution's evidence and sought to explain the inconsistencies in defendant's pretrial statements and the weaknesses in Vivian Cercy's testimony. Defendant nevertheless urges that his counsel was ineffective in failing to argue alternatively that if defendant was the killer, the evidence did not support a finding of murder in the first degree.

Failure to argue an alternative theory is not objectively unreasonable as a matter of law. Defendant has not overcome the presumption that counsel's omission could be considered sound trial strategy, since the inconsistency inherent in arguing both innocence and lack of premeditation or deliberation would be apparent to the jury and would likely draw prosecutorial comment. That the two arguments are not absolutely incompatible does not vitiate a

choice to make one or the other. Thus, counsel might reasonably choose to advance the claim of evidentiary insufficiency, as he did, in a pretrial motion to dismiss under section 995, in a motion for judgment of acquittal under section 1118.1 brought after the close of the prosecution's case, and in a postpenalty-phase motion to reduce the degree of the crime to the second degree, and not make the argument to the jury.

Even if we were to conclude, however, that trial counsel unreasonably failed to argue lack of culpability of first degree murder, we would find no prejudice to defendant. The jury was fully instructed on first degree murder and second degree murder. That it could distinguish the two is clear from its verdicts of second degree murder on count I (Mary Gioia) and first degree murder on count II (Greg Kniffin). The length of deliberations on the question of the degree of the homicides[15] indicates that the jury focused on the issue.

### 5. *Cumulative Error.*

 Defendant urges that the cumulative effect of the errors in the guilt phase mandates reversal of his conviction even if no single error does so. We have identified as possible error only the one instance in which, during his closing argument, the prosecutor misstated Inspector Richardson's testimony, the few instances in which his ambiguous comments might have been taken as an attack on defense counsel's integrity, and several remarks by Patricia Gioia and David Kniffin that strayed beyond what the jury needed in order to form a picture of the circumstances of the crimes. Neither individually nor together do these instances warrant reversal.

## II. PENALTY PHASE

### A. *Evidence.*

#### 1. *Prosecution evidence.*

##### a. *Prior criminal activity involving force or threat of force (§ 190.3, factor (b)).*

Warren Cawley, a correctional officer, testified that on February 13, 1975, he was working in the institutional visiting room at Deuel Vocational

---

[15]On June 2, 1986 (the third day of deliberations), the jury asked for guidance on the distinction between first and second degree murder. The jury failed to reach a verdict that day. On June 3, the jury again asked for instruction on the degrees of homicide. The jury returned the next day and deliberated until 4:05 p.m., when it reached its verdict.

Institute, where he was responsible for enforcing rules and regulations of the Department of Corrections. On that day, defendant was receiving a visit from a woman wearing a low-cut dress. Under departmental regulations, an inmate and a visitor are allowed to kiss and hug at the beginning and the end of a visit. They are permitted to hold hands above the table, but not to fondle or embrace each other. Cawley testified that when defendant's female visitor entered, defendant started to fondle her legs and breasts and kiss her. Cawley repeatedly told defendant to stop this conduct. Defendant would stop briefly, but resume fondling the woman as soon as Cawley got back to his area. The woman left the room for a few minutes. Defendant then walked up to Cawley and said, "Motherfucker, if you don't stop fucking with me I'm going to kill you within the week." Defendant appeared angry, but did not move to strike or grab Cawley. Defendant was removed from the visiting room. Cawley wrote up a rules violation regarding this incident, for which defendant received 10 days in isolation.

James Ingram testified that on April 9, 1977, he was a program administrator at San Quentin Prison. At 2 p.m. on that date he was supervising the service of a meal to inmates. Defendant came through the food line and asked for additional Jell-O. Ingram and another officer told defendant he had received his ration and that was all he was going to get. Defendant threw his tray back at Ingram, striking him on the hip. Defendant received no punishment, but the incident was noted in his prison record.

Raymond Kesner, a correctional officer, testified that at 1 p.m. on March 15, 1978, he was supervising the midday meal at San Quentin's mess hall. As the Maximum B prisoners were about to be fed, defendant entered the room. At that time defendant was a mainline prisoner, scheduled to eat at an earlier time. Kesner informed him that lunch was over and he would have to leave. Defendant said he was late for lunch because he had had an attorney visit. Defendant left the room and reentered through another door. Kesner told him to stand back. Defendant grabbed a tray, came to the serving line, and helped himself to some pie. Kesner stopped the conveyor and ordered defendant to give him the tray. A tugging match developed. Defendant let go of the tray and struck Kesner in the jaw with his fist. The gun officer fired a shot and defendant froze. Kesner wrote a report of rules violation regarding the incident. Following the report, defendant was given 10 days' isolation and lost 30 days of conduct credits.

b. *Prior felony convictions (§ 190.3, factor (c)).*

The trial court took judicial notice of defendant's 12 prior felony convictions. On July 24, 1974, in Monterey County, defendant was convicted of

two counts of rape and one count of armed robbery. On November 1, 1974, in Alameda County, defendant was convicted of two counts of kidnapping, two counts of rape, two counts of violating section 288, subdivision (a), two counts of robbery, and one count of sodomy. The jury in that case found true the allegations that defendant was armed with a deadly weapon (a handgun) during the commission of the offenses, used the weapon in committing the kidnappings, rapes, and robberies, and acted in concert in committing the rapes and sodomy.

### 2. *Defense evidence.*

Vivian Cercy appeared and testified at the penalty phase. The defense hoped that the jury might, on viewing her in person, assess her credibility differently than it had at the guilt phase and therefore entertain a lingering doubt as to defendant's guilt.

Cercy essentially repeated the testimony she had given at the preliminary hearing. She denied that she was intoxicated on the night of August 15 or the early morning hours of August 16, and denied telling Wolke she had had quite a bit to drink; she said she had drunk four or five beers in the hours since noon on the 15th. When she talked with Wolke, she did not know that a second body had been recovered from the bay. She also denied telling Vincent Johnson that she had not seen anything on the night of the murders.

Cercy testified that she had read very little of the transcript of her preliminary hearing testimony, and had ripped it up and thrown it away. She testified that she had not discussed the case very much with defense counsel, but admitted on further examination that she had met with counsel several times and revisited the crime scene with them.

At the preliminary hearing, Cercy did not know whether there was a moon on the night of the murders; at trial, she said there was no moon.

Marshall Perkins, a retired correctional lieutenant, testified that he knew defendant from 1979 to 1981 at San Quentin. In 1978 defendant was in Maximum B custody. Eventually he was assigned to the mainline and was given a job in the bakery, where only reliable inmates not considered to be a danger to staff were allowed to work. Perkins testified that, to his knowledge, defendant was never involved in prison gangs or contraband activities. After he retired, Perkins operated a tree maintenance business. After defendant's release from prison, Perkins occasionally hired him from the cash labor office to work in his business. Defendant had been a guest in Perkins's house and shared meals with Perkins and his wife.

Defendant's mother, Hattie Henderson, testified that defendant was born in the small town of Brenham, Texas, in 1954. He was one of five surviving children. She separated from her husband when defendant was four years old and moved with her children to Houston. Because defendant and his sister Teresa were having difficulty adjusting to their parents' separation, Mrs. Henderson sent them back to live with their father for six or eight months. Thereafter, they resided with their mother and the rest of their siblings in Houston. To earn a living, Mrs. Henderson worked as a maid and took in washing and ironing.

Defendant attended school through the sixth grade. He was a good student and was involved in scouting. Once he received an award for saving another boy from drowning. When defendant was 12 or 13, he ran away from home. The family located him in Tucson. On his return to Houston, Mrs. Henderson sent defendant to live in a home that was like a boys' camp. After a few months at the home, he again ran away. Thereafter, with his mother's acquiescence, defendant lived on his own.

Emma Allen, defendant's sister, testified that she helped her mother raise the children while her mother was working. Defendant was not a discipline problem. Ms. Allen remembered defendant's receiving a commendation for saving a boy from drowning. She testified that defendant did not adjust well to city life in Houston and missed their father.

B. *Issues.*

1. *Victim impact argument.*

Defendant contends that portions of the prosecutor's penalty phase argument were improper under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and violative of the Eighth Amendment. (See also *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207].) The prosecutor urged the jury to have sympathy for the victims of defendant's past and present crimes and for the families of Mary Gioia and Greg Kniffin. He also expressed the hope that Mary and Greg did not suffer when defendant shot them.

During the pendency of this appeal both *Booth* and *Gathers* were largely overruled. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597].) We have since held that the injury inflicted by the defendant—including the impact of the crime on the family of the victim—is one of the circumstances of the crime, evidence of which is admissible under section 190.3, factor (a). (*People* v. *Edwards, supra,* 54 Cal.3d at pp. 833-836; see

*People* v. *Haskett, supra,* 30 Cal.3d pp. 863-864 [suffering of victim during perpetration of brutal crimes held proper subject of evidence and argument as circumstance of crime]; *People* v. *Douglas* (1990) 50 Cal.3d 468, 536-537 [268 Cal.Rptr. 126, 788 P.2d 640] [permitting prosecutor's brief comments on effect of defendant's crimes on victims' families]; *People* v. *Benson, supra,* 52 Cal.3d at pp. 795-797 [permitting prosecutorial argument on apparent suffering of victims of defendant's prior crimes when victims' testimony had been admitted under § 190.3, factor (b) ("criminal activity by the defendant which involved the use or attempted use of force or violence . . .")].)

In closing argument, the prosecutor told the jury that "your sympathies should go to all the victims of the defendant's depraved past and present . . . ." The trial court overruled defense counsel's objection, stating that the prosecutor could "make reasonable comment on the victims and the concern and the victim's [*sic*] family . . . ." The prosecutor continued his argument by urging the jury to "have sympathy also for the families of Mary Gioia and Greg Kniffin, because their lives are never going to be the same." These brief exhortations were not improper. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 835; *People* v. *Benson, supra,* 52 Cal.3d at pp. 795-797; *People* v. *Douglas, supra,* 50 Cal.3d at p. 537.) Nor, clearly, was it improper to express the hope that the victims did not experience pain when defendant pulled the trigger.

 Defendant urges that the guilt phase testimony of Patricia Gioia and David Kniffin improperly affected the jury's determination of his penalty. We concluded above that the testimony of Mrs. Gioia and Mr. Kniffin was properly admitted to establish certain circumstances of the crimes (specifically, how Mary and Greg came to be at Rainbow Village) and that none of the parents' brief, spontaneous remarks concerning the victims' backgrounds and other matters could have adversely affected the jury's determination of his guilt. Because the jury was entitled to consider the parents' testimony insofar as it showed the circumstances of the crimes (§ 190.3, factor (a)), the testimony did not taint its penalty assessment. And the remaining brief remarks were not so inflammatory as to invite an irrational or purely subjective response by the jury. The prosecutor, who did not refer to the parents' guilt phase testimony in making his penalty phase arguments, did nothing to increase the likelihood of such a response.

### 2. *Prosecutorial misconduct.*

Defendant identifies several portions of the prosecutor's closing penalty phase argument as misconduct.

First, he contends the prosecutor improperly accused defense counsel of contriving Vivian Cercy's penalty phase testimony. We set forth the challenged comments in the margin.[16] The general tenor of the comments is critical of Cercy's credibility, but it is a truism that the prosecutor may try to persuade the jury, on the strength of the evidence, that a witness is unworthy of belief. Although such locutions as "coached testimony" are to be avoided when there is no evidence of "coaching," the prosecutor's statements in this case did not reach the level of prejudicial misconduct sufficient to deprive defendant of his rights under the Eighth and Fourteenth Amendments.

Defendant next contends that he was prejudiced by the prosecutor's use of the epithets "mass murderer, rapist," "perverted murderous cancer," and "walking depraved cancer" in referring to defendant during closing arguments. Strictly speaking, the former label fit defendant, inasmuch as he had been convicted of rapes and two murders. The latter epithets are within the range of permissible comment regarding egregious conduct on defendant's part. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1248-1249 [283 Cal.Rptr. 144, 812 P.2d 163].) Moreover, in light of the evidence adduced in the long trial of this case, they could not have carried such an emotional impact as to make it likely the jury's decision was rooted in passion rather than evidence.

Finally, defendant argues that the prosecutor engaged in misconduct in urging the jury to vote for death because defendant would likely pose a danger to prison guards in the future. However, it is not misconduct to comment on a defendant's potential for future violence based on evidence in the record. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 257-258 [253 Cal.Rptr. 55, 763 P.2d 906].) In this case, several witnesses testified to defendant's violent outbursts during his earlier incarceration. Defendant protests that these incidents did not constitute serious crimes. Indeed, his counsel countered the prosecutor's comments by arguing at length that defendant's prison outbursts were treated as minor infractions by prison authorities and that defendant was a "good citizen" by San Quentin standards. Defendant fails to establish misconduct.

---

[16]"Okay, now, let's look at some of her prior testimony that was read to you from the preliminary hearing and let's prove to you that how indeed her testimony was shaped by facts she had gotten from somebody we'll never know or do you want to guess who it might have been?"

"In November she doesn't know if there's any moon light out there that night. Enkerud testifies at the trial there was no moon and Miss Cercy at this penalty phase knows there's no moon light out tonight. She's met with the defense team five times and yet she now knows that there was a moonless night and the city of Berkeley hills provided the illumination of Rainbow Village. That's just amazing. But she didn't discuss her case with anybody."

"Any lingering doubt based on her coached, penalty phase testimony, should be just cast upon the winds. His guilt is now etched in stone, just about like the Ten Commandments."

### 3. *Effect of guilt phase argument on penalty phase determination.*

During his guilt phase argument, the prosecutor suggested, based on the condition of Mary's clothing, that she might have been killed in the course of trying to resist defendant's sexual advances. Before the penalty phase began, defense counsel moved *in limine* to bar the prosecutor from arguing this sexual motive theory to show attempted rape under the rubric of aggravating factor (b), other criminal activity by defendant. (§ 190.3, factor (b).)[17] The trial court agreed that insufficient evidence of attempted rape had been presented to warrant a factor (b) argument and further ruled that the prosecutor could not associate the possible sexual motive for Mary's murder with defendant's prior rape convictions.

 Defendant argues that this ruling came too late to avoid prejudice. He contends the jury was likely, on hearing of defendant's prior rape convictions, to recall the sexual motive argument and improperly consider defendant's alleged sexual attack on Mary as an aggravating factor. We disagree. The trial court instructed the jury that "[e]vidence has been introduced for the purpose of showing the defendant has committed other criminal acts including battery, and including threatening a police officer—a peace officer which involved the express or implied use of force or violence or the threat of force or violence. Before you may consider any criminal acts, any of the criminal acts as aggravating circumstance in this case, you must first be satisfied, beyond a reasonable doubt, that the defendant did, in fact, commit those acts. You may not consider any evidence of any other criminal acts as an aggravating circumstance." This instruction clearly and correctly conveyed to the jury the scope of their determination under factor (b), and defendant points to nothing in the record suggesting that the jury misunderstood its duty. We are unpersuaded by defendant's speculation that the jury rendered an unreliable penalty determination due to the prosecutor's sexual motive argument during the guilt phase. Even more speculative and unpersuasive is his assertion that the jury used the sexual motive argument to "corroborate" the penalty phase argument that defendant would pose a danger to female prison guards if he were sentenced to life without possibility of parole.

### 4. *Trial court's responses to jury inquiries.*

During its deliberations, the jury asked the trial court two questions indicating a concern about the consequences of their penalty determination

---

[17]Section 190.3 requires the trier of fact, in determining the penalty, to take into account the following factor, if relevant: "(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

and of a failure on their part to reach a unanimous decision. Defendant contends that the trial court's answers were inadequate to protect his Eighth Amendment right to a fair penalty trial.

The first question requested "a clarification of the appeal aspects of our decision as in a death sentence can be appealed and continue through the judicial system for years, correct? Is a sentence of life without possibility of parole also subject to appeal and challenge or is it essentially irrevocable?" With the agreement of both the prosecutor and defense counsel, the trial court responded as follows: "Anyone convicted of a crime no matter what penalty is given has appellate rights. However, it would be a violation of the juror's duty to consider the defendant's appellate rights in determining the appropriate sentence in this case. You're not to concern yourself."

The second question asked, "What would be the action taken by the court in the event that the jury is unable to reach a unanimous decision?" The court replied, "That again is not for the jury to consider or to concern itself with. You must make every effort to reach a unanimous decision if at all possible."

▇▇▇ Defendant infers that, taken together, the questions showed that the jury was concerned that if it could not reach a verdict, defendant might be given a sentence less than life without possibility of parole and might someday be released from prison. Consequently, he argues, the trial court should have explained to the jurors that their inability to reach a verdict could not result in a sentence less than life without possibility of parole, but would only result in a retrial of the penalty phase. Defendant acknowledges that our decisions in such cases as *People* v. *Belmontes* (1988) 45 Cal.3d 744, 813-814 [248 Cal.Rptr. 126, 755 P.2d 310], dictate a different conclusion, but contends that those decisions are in error. He analogizes this case to those in which jurors ask the trial court about the effect of a verdict of not guilty by reason of insanity. It has been held in the latter type of case that a defendant is entitled to an instruction on the effect of a verdict of not guilty by reason of insanity because the jury might otherwise be swayed by fears that a defendant acquitted on the basis of insanity will go free. (*People* v. *Dennis* (1985) 169 Cal.App.3d 1135, 1139-1140 [215 Cal.Rptr. 750].) His analogy is unpersuasive. We find no likelihood that the jury could have returned a death sentence because it feared he would receive a sentence less than life without possibility of parole in the event they could not unanimously agree. ▇▇▇ ▇▇▇ Moreover, we believe an instruction of the kind defendant contends was required would have diminished the jurors' sense of duty to deliberate and to be open to the ideas of their fellow jurors. (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1114-1115 [248 Cal.Rptr. 510, 755

P.2d 960].)[18] The trial court's refusal to give the requested instructions was not erroneous.

 5. *Refusal to allow defense counsel to reopen examination of Vivian Cercy.*

Vivian Cercy testified at the penalty phase regarding her observations on the night of the murders. The defense hoped her testimony would raise in the jurors' minds a lingering doubt as to defendant's guilt, which might be sufficient to induce them not to recommend the death penalty. She testified on cross-examination that she had had several meetings with defense counsel, but had not discussed her proposed penalty phase testimony in great detail. On redirect, she recalled recently visiting the crime scene with defense counsel and discussing her observations with them. She described how her visit to the scene had caused her to alter some of her previous testimony.

After Cercy finished testifying, before the close of the penalty phase evidence, the jury submitted several questions raised by her testimony.[19] The second of these questions, and pertinent portions of the in-chambers colloquy it generated, are as follows:

"The Court: 'The witness today, on first cross-examination recalled in order the different recent encounters with Attorney Cercy—"I think we all agree he means Chaffee, not Cercy"—how is it she didn't recall visiting the site with him?'

"My reaction to that question, that is really a question of trying to rehabilitate. It sounded like there's confusion in the jury's mind that needs to be clarified, but a question as to whether you should be able to rehabilitate her because the jury has a question regarding her memory, I don't think that

---

[18]There is no merit to defendant's contention that the fact that this case arises under the 1978 death penalty law requires a different conclusion. As we stated in *People* v. *Belmontes*, *supra*, 45 Cal.3d at page 814: "We conclude that such an instruction [informing the jury of the consequences of its failure to reach a unanimous verdict] under the 1978 death penalty law would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process. Penalty phase juries are presently instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further instruction along the lines suggested herein could well serve to lessen or diminish that obligation in the jurors' eyes. [Citations and fn. omitted.]"

[19]The first question expressed confusion as to whether Cercy's testimony was that she was positioned in front of her car after emptying the trash. The defense was permitted to recall Cercy to clarify that point. The third question asked why the jury was hearing Cercy's testimony and how it related to the penalty or special circumstances. The trial court told the jury that question would be addressed in final argument.

comes within the proper ambit of a proper question for the jury to present. But you said you wanted to make an offer?

"Mr. Chaffee [defense counsel]: I would request the court's permission to reopen and ask her some questions about that. Because the testimony that was elicited from her by Mr. Anderson [the prosecutor] on direct, does not constitute the sum total of all the contacts she has had with me and Susan Walsh since she arrived here.

"My offer of proof would be, she has seen one or the other, or both of us, almost every day since she first arrived here. There have been many visits.

"And I do not believe that her omitting, when she was first questioned by Mr. Anderson, the fact that she went out to the site with Susan Walsh and me on a particular date, which I can't even recall at the moment, was willful on her part or shows that she forgot or anything like that.

"The Court: That's fine. And that's perhaps something that you may be able to argue.

"But the proper purpose of allowing the jury questions is to allow them anything where there is confusion or something that they feel it is a question that needed to be answered. And sometimes, if we both agree upon it and ask the question, or we say it is irrelevant, and we're not going to let that be asked.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Question number two is really a question whether you should be allowed, because the jury has some doubt about the memory or veracity, to be allowed to rehabilitate because of the jury raising the question.

"And the court's ruling, that is not the purpose of jury questions. And I will not allow that question to be asked or that subject to be covered."

Defense counsel requested leeway to clarify Cercy's testimony, noting that he omitted to ask questions for that purpose on redirect. The court asked whether he proposed to ask Cercy how was it she did not recall visiting the site with counsel; counsel said he did not. The court ruled that any other question would be improper, because that was the question the jury had asked.

■■■ Defendant contends that the trial court erred in denying permission to reopen Cercy's examination. He asserts that the trial judge must have

believed, erroneously, that he lacked discretion to do so. He points out that Evidence Code section 778 gives the trial court general discretion to recall a witness, without excluding situations involving rehabilitation of a witness.[20] Defendant's point lacks merit. The trial court's remarks reflect not a belief that it lacked discretion to recall Cercy, but rather a determination that the purpose for which counsel sought to recall her was inappropriate. Its ruling was an exercise, not an abdication, of its statutory discretion. This case is therefore distinguishable from *People* v. *Raven* (1955) 44 Cal.2d 523 [282 P.2d 866], in which we held it error to refuse a defense request to recall a prosecution witness in order to lay a foundation for impeachment, when the trial court believed it was powerless to permit further cross-examination of the witness unless the prosecution reopened its case. (*Id.* at pp. 525-526.)

The court's exercise of its discretion was sound. The testimony defense counsel proposed to elicit on recall—that she had had many meetings with counsel—would not have enhanced Cercy's credibility. Indeed, it could have cast further doubt on her claim that she did not discuss the case with counsel to any great extent. Nor would it have clarified the other inconsistencies in her testimony. Defendant fails to demonstrate error in the trial court's ruling.

> 6. *Defense counsel's stipulation to delete instruction on intoxication from penalty considerations.*

Section 190.3, factor (h) (factor (h)), provides that the jury may consider as a mitigating factor, if relevant, "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication." Defense counsel stipulated that the language of factor (h) (and other inapplicable factors) be deleted from the jury instruction on factors for consideration in determining penalty. (Former CALJIC No. 8.84.1; see now CALJIC No. 8.85.) Now, pointing to the testimony of David Bergman and Jim Prew, and to his own extrajudicial statements indicating he had drunk alcohol and smoked marijuana on the evening of the killings, defendant contends counsel was incompetent in making the stipulation and that the omission of factor (h) language from the instruction prejudiced him.

We reject the contention. First, in his penalty phase argument defense counsel urged the jury to entertain a lingering doubt of defendant's guilt. Counsel did not argue that if defendant did commit the crimes, his ability to

[20]Evidence Code section 778 provides that "[a]fter a witness has been excused from giving further testimony in the action, he cannot be recalled without leave of the court. Leave may be granted or withheld in the court's discretion."

appreciate the criminality of his conduct was impaired due to intoxication. Moreover, evidence of intoxication was lacking. No witness testified that defendant appeared intoxicated before the murders. No witness testified to the consumption of such a large quantity of drugs or alcohol by defendant as to lead to the conclusion that he was intoxicated. Defendant himself, in his extrajudicial statements, did not suggest that he felt intoxicated. ▆ A defendant's mere consumption of drugs or alcohol before the commission of a crime is generally insufficient to warrant an instruction on diminished capacity. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 89 [241 Cal.Rptr. 594, 744 P.2d 1127].) ▆ We find no substantial evidence in this record that defendant was intoxicated when he committed the crimes. Had the omitted instruction been given, the lack of evidence of intoxication makes it unlikely that the jury would have drawn the desired mitigating inference. Defense counsel was not, therefore, incompetent in agreeing that the factor (h) instruction need not be given. That the jury's deliberations were relatively lengthy does not warrant a different conclusion.

### 7. *Automatic application for modification of death verdict.*

During the hearing on the automatic application to modify the death verdict (§ 190.4, subd. (e)),[21] the trial court stated it had considered the evidence and the law and examined each sentencing factor listed in section 190.3. ▆ As to factor (h), the trial court observed that there was no evidence on the issue. Calling our attention again to the evidence that he had drunk alcohol and smoked marijuana on the night of the crimes, defendant contends the trial court erred in making this observation, and must therefore have failed to meet its statutory duty under section 190.4.

The trial court did not err. As we have seen, the record was devoid of testimony that defendant appeared intoxicated, and the evidence of his consumption of alcohol and marijuana did not substantially support an

---

[21]Section 190.4, subdivision (e), provides as follows:

"In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section [1181]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.

"The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the People's appeal pursuant to paragraph (6) [of Section 1238]."

inference that he was in such a state. Defendant has not shown that the trial court failed to take mitigating evidence into account or to discharge its obligation under section 190.4, subdivision (e).

### 8. *Cumulative error.*

 Finally, defendant contends that the cumulative effect of errors in the penalty phase requires reversal of his death sentence. Since we have found no defect in the penalty phase beyond a nonprejudicial prosecutorial reference to Cercy's testimony as "coached," this contention must fail.

### Disposition

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it affirms defendant's conviction for the second degree murder of Mary Gioia. After review, I have found no reason to disturb the jury's verdict on this issue.

I dissent from the judgment, however, insofar as it affirms defendant's conviction for the first degree murder of Gregory Kniffin. The jury's verdict here cannot stand. Guilt rests solely on the theory of willful, deliberate, and premeditated murder. But that theory, as I shall show, is without adequate evidentiary support.

In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.) To my mind, we must ask the same question when we conduct such review under the due process clause of article I, section 15 of the California Constitution.

The following principles appear applicable to sufficiency-of-evidence analysis under both the federal and state charters.

The evidence that we view is the evidence *in its entirety.* (*People* v. *Johnson* (1980) 26 Cal.3d 557, 577 [162 Cal.Rptr. 431, 606 P.2d 738, 16

A.L.R.4th 1255] [decided expressly under the due process clause of U.S. Const., Amend. XIV, and impliedly under the due process clause of Cal. Const., art. I, § 15].) In other words, although we weigh the facts in favor of the People's position, we do not weigh only such facts as are favorable thereto. "[W]e must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by" the People on appeal. (*People* v. *Johnson, supra,* at p. 577, italics in original.)

To be sufficient, evidence must of course be substantial. (See, e.g., *People* v. *Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843] [decided impliedly under the due process clauses of U.S. Const., Amend. XIV, and Cal. Const., art. I, § 15].) It is such only if it " 'reasonably inspires confidence and is of "solid value." ' " (*People* v. *Morris, supra,* at p. 19.) By definition, "substantial evidence" requires *evidence* and not mere speculation. In any given case, one "may *speculate* about any number of scenarios that may have occurred . . . . A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." (*Id.* at p. 21, italics in original, paragraph sign and internal quotation marks omitted.)

Further, the evidence must be capable of supporting a finding as to every fact required for conviction *beyond a reasonable doubt.* Any such doubt must, of course, be "reasonable"—but nothing more. It plainly need not be "grave" or even "substantial." (*Cage* v. *Louisiana* (1990) 498 U.S. 39, __ [112 L.Ed.2d 339, 342, 111 S.Ct. 328, 329] [decided under the due process clause of U.S. Const., Amend. XIV] (*per curiam*).) What is required, in a word, is "near certainty" (*People* v. *Hall* (1964) 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700] [decided under general principles of law]) or "evidentiary certainty" (*Cage* v. *Louisiana, supra,* at p. __ [112 L.Ed.2d at p. 342, 111 S.Ct. at p. 330] (*per curiam*)).

A state-court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason. (*Jackson* v. *Virginia, supra,* 443 U.S. at pp. 313-324 [61 L.Ed.2d at pp. 569-577].) In my view, a California conviction without adequate support separately and independently offends, and falls under, the due process clause of article I, section 15.

I now turn to the issue whether the evidence is sufficient to support defendant's conviction for the willful, deliberate, and premeditated murder of Kniffin.

The specific question concerns the elements of premeditation and deliberation—or strictly, premeditated and deliberate intent to kill.

Traditionally, "premeditated" has been defined as "on preexisting reflection," and "deliberate" as "resulting from careful thought and weighing of considerations." (See generally *People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942], and cases cited.) The terms have been further defined by their antonyms: "premeditated" is not "spontaneous"; and "deliberate" is not "hasty," "impetuous," "rash," or "impulsive." (See generally *People* v. *Hilton* (1946) 29 Cal.2d 217, 222 [174 P.2d 5]; *People* v. *Thomas* (1945) 25 Cal.2d 880, 901 [156 P.2d 7].)

In *People* v. *Anderson, supra,* 70 Cal.2d 15, we stated in pertinent part as follows.

"The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People* v. *Anderson, supra,* 70 Cal.2d at pp. 26-27, italics in original, citation omitted.)

From the very day we decided *Anderson,* we have construed its language to be normative as well as descriptive. The rule is this: the evidence is sufficient as to premeditation and deliberation if and only if there is (1) evidence of planning *and* motive *and* manner; or (2) extremely strong evidence of planning; or (3) evidence of motive *and* either planning *or* manner.

Here, there is no substantial evidence that defendant planned an attack on Kniffin. Indeed, the record is essentially devoid of "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing . . . ." (*People* v. *Anderson, supra,* 70 Cal.2d at p. 26, italics in original.) For argument's sake only, I shall assume that the fact that defendant had to manually reload his rifle may amount to some evidence that he "planned" *the second killing.* Such evidence, I hasten to add, would be at best minimal: inasmuch as defendant was readily familiar with the weapon, he could manipulate it by reflex action. Be that as it may, there is absolutely no evidence that the victim of the second killing was in fact *Kniffin.* Of course, the evidence allows speculation that the murder of Kniffin was planned. But as stated, speculation is not evidence, less still substantial evidence.

The majority purport to find some evidence of planning in (1) the absence of facts as to whether or not defendant had his rifle in his possession when he was last seen in the company of Kniffin and Gioia; (2) the fact that he had to manually reload the weapon; and (3) the asserted fact that the rifle would not otherwise have been available at the time and place of the murders. The first point is logically unsound. The absence of facts cannot yield the presence of facts: *ex nihilo nihil fit.* The second founders on the analysis set out in the preceding paragraph. The third is inadequate in and of itself. Apparently, the weapon was readily available. True, the hour of the killings was late. The location, however, was hard by Rainbow Village, where the rifle was kept.

Next, there is no substantial evidence that defendant had a motive to kill Kniffin. Again, the record is essentially devoid of "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim . . . ." (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27, italics in original.) As the trial court observed, the record reveals that defendant acted "without apparent motive, nor any rhyme nor reason."

The majority purport to find some evidence of motive in a sexual-attack theory devised by the prosecutor in summation at trial and/or a witness-elimination theory fashioned by the Attorney General in his brief for the People on appeal. Surely, the evidence allows speculation in accordance with the prosecutor's theory. But it simply does not support a factual inference to that effect. Again, speculation is not evidence, less still substantial evidence. The same is true as to the Attorney General's theory.

Finally, there is no substantial evidence that defendant employed a manner of killing Kniffin that reveals forethought and reflection. The record is weak

as to "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of" planning or motive. (*People* v. *Anderson*, *supra*, 70 Cal.2d at p. 27, italics in original.)

Had the attack on Kniffin consisted of a single shot *and nothing more*, the case might perhaps be different. Such a situation would arguably suggest a so-called "execution-style" killing—which is "particular and exacting" practically by definition.

The actual attack, however, was not of this sort: Kniffin was savagely beaten over virtually his whole body before he was shot. The situation that the facts unambiguously disclose points toward a killing done spontaneously and impulsively in unchecked and undiscriminating fury—a method that is neither "particular" nor "exacting."

The majority purport to find some evidence of a manner of killing revealing forethought and reflection in the single shot. In isolation, that fact must be deemed significant. In context, however, it cannot be considered substantial. To be sure, the evidence supports an inference of intent to kill. But such an intent does not amount to or entail premeditation or deliberation in and of itself. (See *People* v. *Anderson*, *supra*, 70 Cal.2d at p. 26.)

In view of the foregoing, a rational trier of fact could not have found defendant guilty beyond a reasonable doubt of the first degree willful, premeditated, and deliberate murder of Kniffin.

Put simply, premeditation and deliberation were not established to a "near certainty" (*People* v. *Hall*, *supra*, 62 Cal.2d at p. 112) or to an "evidentiary certainty" (*Cage* v. *Louisiana*, *supra*, 498 U.S. at p. __ [112 L.Ed.2d at p. 342, 111 S.Ct. at p. 330] (*per curiam*)).

The record does not reveal that defendant formed an intent to kill "on preexisting reflection" "resulting from careful thought and weighing of considerations."

Certainly, the case here does not come within the *Anderson* rule. There is no evidence of planning *together with* motive *together with* manner. Neither is there extremely strong evidence of planning. Finally, there is no evidence of motive *together with* either planning *or* manner.

Therefore, the evidence is insufficient to support defendant's conviction for the first degree willful, deliberate, and premeditated murder of Kniffin.

Accordingly, I would set aside the first degree murder conviction. I would then vacate the special circumstance finding because of the absence of its predicate—a conviction of first degree murder. (See Pen. Code, § 190.2, subd. (a).) And I would then set aside the sentence of death because of the absence of *its* predicate—a conviction of first degree murder under special circumstances. (See *ibid.*)

KENNARD, J., Concurring and Dissenting.—Was there sufficient evidence that defendant premeditated and deliberated the murder of Greg Kniffin? I conclude there was not. Therefore, I would reverse defendant's conviction for the first degree murder of Greg Kniffin. I would, however, hold the evidence sufficient to convict defendant for the second degree murder of Kniffin. With respect to the killing of Mary Gioia, I join the majority in affirming defendant's conviction for second degree murder.

## I. FACTS

Viewed in the light most favorable to the prosecution (*People* v. *Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376]), these are the relevant facts:

Defendant was a resident of "Rainbow Village" in Berkeley, an area that had been set aside for the homeless. At the time of the crimes, numerous followers of the Grateful Dead rock band were staying at the village. Among them were Gioia and Kniffin. Each was beaten and shot to death on the morning of August 16, 1985. The cause of each death was a single contact wound to the head or neck. Gioia's body was found floating in the San Francisco Bay on August 16, and Kniffin's body was recovered from the bottom of the bay the next day.

The evidence was circumstantial. One witness testified that defendant was standing with the victims at 2:30 a.m. on August 16, 1985, and looked "grim." Defendant told several people the next morning that his .44-magnum rifle had been stolen. His pipe, which he said he had used to smoke marijuana with the victims, was found near the scene of the shootings. Later that day, defendant asked another village resident, Thomas Medlin, to hide defendant's ammunition. Other residents made similar requests of Medlin, anticipating a search of the village by the police.

As Gioia's body was being removed from the bay on August 16, 1985, defendant said, "That's Mary." The statement was made before a police officer, who was standing about 30 feet from the body and 15 feet closer than defendant, could tell if the body was male or female. In response to a

police officer's question, defendant said that he could think of plenty of reasons why someone would want to murder the victims. When the officer asked him to name one, defendant said he could not think of any at the time.

A firearms expert and retired police inspector, Jack Richardson, testified that, based on his examination of post mortem photographs of Gioia's wounds, the exit wound would be normal for a high-powered rifle or shotgun. There was no evidence regarding the kind of weapon that inflicted Kniffin's wound.

## II. DISCUSSION

Under *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942] (*Anderson*) and its progeny, we look to three types of evidence, "planning," "motive," and "manner," to determine whether there is sufficient evidence of premeditated murder. A reviewing court will uphold a first degree murder conviction when there is evidence of all three types, when there is "extremely strong evidence" of planning, or when there is evidence of motive in conjunction with evidence of either planning or manner. (*Id.* at p. 27.)

### A. *Planning*

Planning evidence encompasses "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing— what may be characterized as 'planning' activity . . . ." (*Anderson, supra,* 70 Cal.2d at pp. 26-27, original italics.)

In this case, the majority concludes that because witness Vince Johnson testified he saw defendant with the victims about 2:30 a.m. on the night of the killings, but did not mention seeing a rifle, defendant must have had to return to his car to get the rifle before committing the murders. Johnson, however, was never asked whether he saw a rifle; his failure to respond to a question that was never asked is not evidence of anything. Moreover, even if Johnson had testified he did not see a rifle, this would not prove that defendant had no rifle; it would merely show that on a dark night, from a distance, a witness who testified he "tried not to look" at defendant because he wanted to mind his own business did not see a rifle. The majority further infers that defendant must have planned the killings because they occurred in a place "where a weapon would not have been readily accessible . . . ." (Maj. opn., *ante,* at p. 518.) Yet this adds nothing to the majority's speculation that defendant must have had to return to his car to obtain the rifle. The

majority observes that the murders occurred "at an hour when activity would not normally be taking place." (*Ibid.*) But in view of the fact that Rainbow Village residents were actively drinking and socializing near the time when the killings apparently took place, this cannot give rise to a rational inference of planning activity.

The majority also suggests that because defendant's rifle had to be re-loaded after each shot, defendant must have planned to kill Kniffin while reloading it. (Maj. opn., *ante*, at p. 517.) But the time lag necessitated by reloading the rifle cannot support an inference that defendant must have planned to kill Kniffin during the time it took to reload, because the jury had no way of determining whether Kniffin was defendant's first or second victim.

In its discussion of the planning evidence here, the majority cites *People* v. *Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126]. There, this court reasoned that "when one plans a felony against a far weaker victim, takes her by force or fear to an isolated location, and brings along a deadly weapon which he subsequently employs," advance planning to kill may be reasonably inferred. (*Ibid.*) Here, there is no evidence of a separate planned felony against Kniffin, no evidence that Kniffin was a victim far weaker than defendant, and no evidence that he was taken by force or fear to an isolated location. And as *Alcala* cautions, use of a deadly weapon is not necessarily evidence of a plan to kill. (*Ibid.*)

Thus, there is no substantial evidence of what defendant did before the killings that shows he was engaged in activity directed toward, and explicable as intended to result in, killing Kniffin. As I will next explain, there is also no evidence of motive.

### B. *Motive*

Motive evidence consists of "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of [planning or manner], would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' . . . ." (*Anderson, supra,* 70 Cal.2d at p. 27, original italics.)

This case lacks any evidence of motive. The trial court declared at the sentencing hearing that the murders were committed "without apparent motive, nor any rhyme or reason." The majority states: "The jury could

conclude that defendant deliberately and premeditatedly killed Greg because he either had witnessed, or was otherwise about to witness, Mary's murder." (Maj. opn., *ante*, at p. 519.) This conclusion is pure speculation.

As noted above, there was no evidence as to which of the two victims was killed first. Nor was there evidence that either victim was killed in the other's presence.

The majority's witness-elimination theory of premeditation was not the basis on which the prosecutor presented the case to the jury. Instead, the prosecutor argued that defendant intended a sexual attack on Gioia, and killed Kniffin when Kniffin came to Gioia's aid. The only evidence that might suggest a sexual motive, however, was that the zipper of the outer of two pairs of pants Gioia wore was partway down when her body was recovered. But this evidence is consistent with the pathologist's testimony that Gioia's body was dragged over rough ground. Without more, the zipper evidence is insufficient to support the conclusion that Gioia was killed for a sexual reason. The prosecutor's added hypothesis that Kniffin was killed when he came to Gioia's aid is just that: hypothesis, not evidence.

The majority does not attempt to resolve whether the prosecutor's sexual-attack hypothesis would show a motive for Kniffin's murder. Even if the evidence somehow established a motive for Gioia's murder, with respect to Kniffin's murder it has the same problems as the majority's witness-elimination theory: There was no evidence as to which victim was killed first. Nor was there evidence that either victim was killed in the other's presence.

The theory that defendant killed Kniffin to eliminate him as a witness to the prior, apparently unmotivated, murder of Gioia founders on the absence of any evidence that Gioia was killed before Kniffin. On the other hand, if, as the majority speculates, defendant killed Kniffin to eliminate him as a witness to the killing of Gioia that was about to occur, then defendant must have had an independent motive for the murder of Gioia that the jury could rationally infer from the evidence. But no such independent motive appears. In any event, there is no evidence that Kniffin was killed before Gioia.

The majority deals with these multiple evidentiary failings by declaring "[t]here is no evidence that both victims were not present together at the time of the murders." (Maj. opn., *ante*, at p. 519.) But the absence of evidence is not evidence. Moreover, even if the evidence did show that the two victims were together at the time of the murders, this still would not

establish which victim was killed first, or why. Temporal and spatial proximity do not, by themselves, tell us anything about motive.

Instead of motive (or "prior relationship") evidence that supports a conclusion that the killing was "the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' " (*Anderson, supra*, 70 Cal.2d at p. 27), the evidence here is more consistent with an explosion of violence. The evidence showed that both victims were badly beaten before being killed. Although we may surmise that, because it was necessary for defendant to reload the rifle before shooting his second victim, the required break to reload provided an opportunity for reflection, this would only tend to show premeditation as to defendant's second victim. There is no evidence that Kniffin was defendant's second victim.

In short, the record is devoid of any evidence about defendant's prior relationship or conduct with Kniffin from which the jury could reasonably infer a motive to kill him.

Implicitly recognizing this, the majority relies on *People v. Edwards* (1991) 54 Cal.3d 787, 814 [1 Cal.Rptr.2d 696, 819 P.2d 436] for the proposition that we "have never required the prosecution to prove a specific motive before affirming a judgment . . . of first degree murder." This is correct. In *Anderson*, we stated that first degree murder judgments would be affirmed even in the absence of motive evidence when there was "extremely strong evidence" of planning. (*Anderson, supra*, 70 Cal.2d at p. 27.) In *Edwards*, this court adhered to *Anderson*; although there was no evidence of motive, we upheld the conviction of first degree murder in *Edwards* because of "extremely strong evidence of planning . . . ." (*Edwards, supra*, 54 Cal.3d at p. 814.) By contrast, here there is no substantial evidence of planning.

### C. *Manner*

The third type of evidence recognized by this court's cases as useful in determining premeditation is evidence of the manner of killing. Manner evidence encompasses "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of [planning or motive]." (*Anderson, supra*, 70 Cal.2d at p. 27, original italics.)

Here, the majority states: "Both victims were killed by single contact shots, to Mary's head and Greg's neck, a method sufficiently ' "particular

and exacting" ' to warrant an inference that defendant was acting according to a preconceived design. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1050 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Bloyd* [(1987)] 43 Cal.3d [333,] 348 [233 Cal.Rptr. 368, 729 P.2d 802].)" (Maj. opn., *ante*, at p. 518.) In *People* v. *Caro* (1988) 46 Cal.3d 1035 [251 Cal.Rptr. 757, 761 P.2d 680], there was no evidence of a struggle, and we concluded that a close-range gunshot to the head was "arguably sufficiently 'particular and exacting' to permit an inference that defendant was acting according to a preconceived design." (*Id.* at p. 1050.) In *People* v. *Bloyd* (1987) 43 Cal.3d 333 [233 Cal.Rptr. 368, 729 P.2d 802], we determined that "execution-style killings" by shots at close range provided sufficient manner evidence, but found it significant that "there was no evidence, such as bruises or lacerations, to demonstrate a struggle." (*Id.* at p. 348.) This case is different from *Caro* and *Bloyd*. Here, there was considerable evidence of bruises and lacerations preceding Kniffin's death, including evidence that he had been struck by a gun barrel. This evidence is more consistent with a brutal attack than a calculated killing. At most, the evidence permits a very weak inference of manner. The facts do not show "a 'preconceived design' to take [Kniffin's] life in a particular way for a 'reason' which the jury [could] reasonably infer from facts of [planning or motive]." (*Anderson*, *supra*, 70 Cal.2d at p. 27.)

### III. CONCLUSION

Defendant's crimes were brutal and reprehensible; therefore, the jury's decision at the penalty phase to impose the maximum penalty is easily understandable. But when the evidence is measured against the guidelines this court has followed for the last quarter-century in distinguishing premeditated murder from all other murders, the judgment of first degree murder cannot stand. There was no evidence of planning, no evidence of motive, and weak evidence of manner. Under *Anderson*, *supra*, 70 Cal.2d at page 27, there must be evidence of all three types, or extremely strong evidence of planning, or evidence of motive plus evidence of either planning or manner. Applying the criteria of *Anderson* to this case, I conclude there is insufficient evidence to support a rational inference that beyond a reasonable doubt defendant premeditated and deliberated the murder of Kniffin; the evidence is sufficient only for second degree murder.

Accordingly, I would reverse the conviction of defendant for the first degree murder of Kniffin. Because defendant's eligibility for the death penalty is dependent on the judgment of first degree murder (Pen. Code, § 190.3), I would strike the special circumstance finding, and would remand the case for resentencing.

Appellant's petition for a rehearing was denied June 17, 1992. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.