Filed 5/29/15  P. v. Ward CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

| | |
|---|---|
| THE PEOPLE, | C075085 |
| Plaintiff and Respondent, | (Super. Ct. No. P12CRF0422) |
| v. | |
| GARY EUGENE WARD, | |
| Defendant and Appellant. | |

Defendant Gary Eugene Ward appeals his conviction for attempted robbery contending there is insufficient evidence to support the conviction.  He also contends he must be resentenced on his conspiracy to commit theft conviction as the sentence exceeds the lawful maximum.  We agree the matter must be remanded for resentencing.  In all other respects, the judgment is affirmed.

BACKGROUND

Douglas Bennett lived in a large house in Pilot Hill that was known as a "flophouse" because people would stay there and use drugs.  Hilary Estrada, Angel Ashbey, and Heather Stevens were living at the house with Bennett.  In March 2012, Megan Patterson and her two children also stayed at Bennett's home.  Patterson told

1

Bennett she was in an abusive relationship. Patterson left the house after about two weeks, but left her belongings behind.

Max Kurtz was Patterson's ex-boyfriend. On April 24, 2012, Kurtz came to Bennett's home and confronted Bennett about Megan Patterson. He was upset that Patterson and her children were no longer at the house, and told Bennett he wanted to pick up Patterson's belongings. Bennett felt Kurtz was blaming him for Patterson leaving Kurtz and taking the children away from him. Bennett asked Estrada, Ashbey, and Stevens to gather up Patterson's belongings and invited Kurtz to look around the house. Bennett felt uncomfortable, so he left the area. Ashbey found Patterson's belongings and gave them to Kurtz. Stevens walked Kurtz around the house looking for any items belonging to Kurtz's children. While walking around the property, Kurtz saw Bennett's motorcycle. Kurtz asked if the motorcycle was operable and when Ashbey said it was, Kurtz got on and tried to start it. Ultimately, Kurtz drove the motorcycle off the property. Stevens ran into the house and yelled, "He's taking the bike." Bennett and Ashbey reported the motorcycle stolen. The interaction with Kurtz frightened Bennett so much that he stopped staying at his house for a while. Also, after the theft of the motorcycle, Ashbey acquired a single-shot ball and powder pistol and a six-shot revolver.

Bennett had previously dated Tanja Martin. Martin was now dating Logan Helgeson. Martin claimed Bennett had taken pictures of her without her consent when she was undressed and passed out. Bennett kept those pictures on his computer. Martin also said that during their relationship Bennett had pointed a gun at her. Bennett had also been friends with defendant for a couple of years.

Kurtz went to defendant to get the title to the motorcycle from Bennett. About three weeks after Kurtz stole the motorcycle from Bennett's home, defendant approached Helgeson about returning to Bennett's home to get the pink slip for the motorcycle from Bennett. Helgeson had a reputation as a violent person and he and Bennett did not get along. Helgeson knew his role in accompanying defendant to Bennett's home was for

backup and "intimidation." One of the reasons Helgeson agreed to go with defendant was that he was angry about Martin's allegation that Bennett had previously pointed a gun at her. Helgeson was armed with a knife when they went to Bennett's home.

By this time, Bennett was again staying at his home. At approximately 2:00 a.m. on May 14, 2012, defendant, Martin, Helgeson, and another woman, Ayesha Bowen, went to Bennett's home. They pounded on the front door and bedroom wall and woke Bennett up. Bennett told Ashbey, "Tell them I'm not here." Ashbey got out of bed and yelled, "Doug's not here. You know, go away. I'll call the cops." Bennett was afraid, so he hid under the bed. He and Ashbey each grabbed one of the guns they had stored in the nightstand next to the bed. Ashbey began arguing with the group outside the home. Martin let herself in through the backdoor and let in the rest of the group. Ashbey put down her gun, as there were four intruders and her gun only had one shot.

From under the bed, Bennett could see the group. He could see Helgeson had a knife in his hand. The group was trying to find Bennett and Ashbey repeatedly told them to leave. Martin found Bennett hiding under the bed. Bennett heard defendant's voice and was relieved. Bennett had known defendant for a couple of years and felt comfortable with him. So Bennett came out from under the bed to speak to defendant.

Defendant said Kurtz had sent him to get the title to Bennett's motorcycle. Defendant told Bennett he had agreed to come on behalf of Kurtz because he wanted to avoid bloodshed. He did not want to see anything happen to Bennett. Defendant made clear to Bennett that Bennett did not want any problems with Kurtz. Defendant said if Bennett did not sign the title for the motorcycle over to Kurtz, they would be back and things would go badly. He told Bennett, "These people don't play." Bennett understood defendant to mean if he did not give up title to the motorcycle, he would be beaten up. Defendant also told Bennett, "You had this coming. . . . [¶] . . . [¶] . . . You know you had this coming." Bennett was frightened and stuttering. He told defendant he did not have the title because the paperwork had been stolen on a different occasion. Bennett agreed

3

to go to the Department of Motor Vehicles (DMV) and get a copy of the pink slip the next day. Bennett thought this was the best thing to do because he was scared and defendant told him this would avoid bloodshed. Defendant told Bennett he would come back the following night for the title to the motorcycle.

Helgeson returned to the bedroom. He was angry with Bennett, picked up the ball and powder pistol and pointed it at Bennett's forehead. Helgeson wanted to frighten Bennett and get retribution for Bennett previously having pointed a gun at Martin, he cocked the pistol and yelled, "How does it feel?" Bennett was very frightened. Defendant took the gun and cell phone from Helgeson and left them in the closet as he left the bedroom. At the same time, Martin and Bowen, were "[r]unning all over the house" "ransacking stuff." Martin left Bennett's house with a computer carrying case with a hard drive in it. Martin took these because she believed there were pictures and videos of her on the hard drive.

Bennett later noticed things had been stolen from the house. The external hard drive and carrying case were taken from his truck. Also, a case of water and mounted surveillance cameras were taken. The group got into the car and as they were leaving, Bennett came out to the car. Helgeson got out of the car and said, "you're burnt, dude." Because he "knew . . . [Bennett] was going to try to get" the computer case and hard drive Martin had. "You're burnt" meant Helgeson was not going to let Bennett have his property back, even if he had to resort to violence.

Bennett went to the DMV later that day to try to get a copy of the title for his motorcycle. While he was waiting at the DMV, California Highway Patrol Officer Mike Franzen arrived and spoke with him about his stolen motorcycle. Franzen told Bennett he wanted to speak with everyone who had witnessed the motorcycle theft. Bennett never obtained a copy of the title.

Bennett took Stevens to the district attorney's office on May 21, 2012. Stevens was upset and told Franzen that she did not want to talk to him. She told Franzen that Kurtz took the motorcycle, then she left and "stomped off down the street."

The next day, defendant called Stevens and took her for a drive to a rural area where five or six men were playing video games and smoking weed. They told her she could not leave. Kurtz arrived about 15 minutes later and took Stevens into another room to talk to her. He checked her for a wire and took her cell phone. He asked about her conversation with police. Stevens said she had told the police that Kurtz had no weapon when he took the motorcycle. Kurtz told Stevens if the police spoke with her again, she should act "blond and dumb." He also told her that if she testified favorably, he could get her a job as a madam in another state, given her former background as a legal prostitute in Nevada.

## PROCEDURAL HISTORY

An information charged defendant with first degree residential robbery (Pen. Code, § 211 – count 1),[1] residential burglary with a person present (§ 459 – count 2), assault with a firearm (§ 245, subd. (a)(2) – count 3), conspiracy to commit theft (§§ 182, subd. (a)(1), 484/488 – count 5),[2] and dissuading a witness (§ 136.1, subd. (b)(1) – count 6). The information also alleged as to counts 1, 2, and 3, that the principal was armed with a firearm during the commission of the offense. (§ 12022, subd. (a)(1).)

Following trial, the jury found defendant guilty of the lesser included offense of attempted robbery on count 1. (§§ 664/211.) The jury found defendant guilty of residential burglary with a person present, conspiracy to commit theft and dissuading a

---

[1] Undesignated statutory references are to the Penal Code.

[2] The information charged only codefendant Kurtz with vehicle theft in count 4.

5

witness. The jury found defendant not guilty of assault with a firearm and found the firearm enhancement allegations on counts 1, 2, and 3, not true.

DISCUSSION

I

Defendant contends there was not sufficient evidence to support his conviction for the attempted robbery of Bennett. He contends there was insufficient evidence he was the direct perpetrator of the robbery, that any of his companions committed a robbery, or that he was guilty of robbery under either an aiding and abetting or a conspiracy theory. There was no robbery conviction in this case. We find sufficient evidence to support the conviction for *attempted* robbery.[3]

---

[3] Contrary to defendant's claim, we do not view the prosecution's statements in closing argument regarding the robbery as an election as to the theory of the attempted robbery. When a defendant is charged with a single criminal offense, but the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) This requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid*.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid*.) An election or unanimity instruction is required as between discrete crimes, but not required between theories of a case. (*Id.* at pp. 1132-1133.) No election was necessary as to the prosecution's theory of attempted robbery.

Of note, the parties specifically discussed this issue at the sentencing hearing. The prosecution argued there was not an issue under section 654 between the convictions for attempted robbery of the pink slip and the conviction for conspiracy between Kurtz and defendant to steal the pink slip. The court stated, "I respectfully disagree with the argument of [the prosecution]. I think the . . . while the conspiracy is the agreement, but it has to have as an object something that -- conspiring to do something. And in this case, the conspiracy was to go and get the pink slip. And so I think that is 654 to this operation. [¶] The attempted robbery and the 459 [(residential burglary)], the facts that came out at trial were that they went to get the pink slip. . . . [¶] So I think that counts I and V would be stayed pursuant to 654."

6

"On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same." (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We " 'must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Robbery requires the taking of property by means of force or fear. (§ 211.) The specific intent necessary for robbery is the intent to permanently deprive a person of property. (*People v. Dominguez* (1995) 38 Cal.App.4th 410, 417.) An attempted robbery can be committed without causing fear in the victim. (*People v. Vizcarra* (1980) 110 Cal.App.3d 858, 862.) "It is true that an element of force or fear must be proved in order to establish a conviction for robbery under Penal Code section 211. It is not necessary, however, for this element to be reflected in the overt act of an attempted robbery if the crime has not progressed to that point." (*Ibid*.) Rather, to establish an attempted robbery, the People must prove " 'a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission.' [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 24.)

Here, Kurtz stole Bennett's motorcycle. A few weeks later, defendant went to Bennett's house on behalf of Kurtz to get the title to the motorcycle. Defendant solicited Helgeson, a man with a reputation for violence and known animosity toward Bennett, to go with him to get the pink slip for the motorcycle from Bennett. Helgeson was specifically asked to accompany defendant to provide backup and "intimidation." Helgeson was armed with a knife when he went to Bennett's home. Defendant and three other people showed up at Bennett's house at 2:00 a.m., pounded on the door, and demanded entry. Defendant told Bennett to "just do . . . what [Kurtz] wants you to do,

7

and he wants title to the bike, and just do it. . . . [Y]ou don't, . . . want any problems with [Kurtz]." Defendant told Bennett he had come to the house to help avoid bloodshed and defendant did not want anything bad to happen to Bennett. He also made clear if Bennett did not sign over title to the motorcycle to Kurtz things would go badly. It was clear to Bennett defendant was threatening that if he did not comply, he would be beaten up. Defendant was not successful in getting the pink slip from Bennett because he (Bennett) did not have the paperwork at the house, it had previously been stolen.

The evidence shows defendant went to Bennett's house with the intent to permanently deprive him of the pink slip to the motorcycle by using force and fear. He enlisted others to intimidate Bennett; he took a group, one of whom was armed, to Bennett's house early in the middle of the night, and roused him out of bed. In addition to bringing others to intimidate Bennett into compliance, defendant made his own threats of violence and bloodshed if Bennett did not give him the pink slip. Thus, defendant had the specific intent to commit a robbery and he took numerous but ineffectual steps to accomplish that goal, including enlisting others, going to Bennett's home, and threatening Bennett to secure his compliance. This was sufficient evidence to support defendant's conviction for attempted robbery.

II

Defendant next contends his stayed sentence on conspiracy to commit theft (count 5) must be corrected because it exceeds the lawful maximum. The People properly concede this claim.

The information charged defendant with conspiracy to commit theft, citing the petty theft statutes. (§§ 484/488.) The punishment for conspiracy is the same as the target offense. (§ 182, subd. (a).) The punishment for petty theft is a term of 16 months, two, or three years. (§§ 489, subd. (c), 1170, subd. (h).) Thus, the maximum term for conspiracy to commit petty theft is three years. The trial court imposed a term of four years on this charge. Accordingly, defendant must be resentenced on count 5.

8

DISPOSITION

The sentence on count 5 is vacated and the matter is remanded to the trial court for resentencing on count 5.  In all other respects, the judgment is affirmed.


     BLEASE     , J.


We concur:


     RAYE     , P. J.


     BUTZ     , J.