Filed 10/15/25  P. v. Mendez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084226 |
| v. | (Super.Ct.No. BAF2201221) |
| ROMAN RALPH MENDEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  F. Paul Dickerson III, Judge.  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Roman Ralph Mendez of the first degree murder of Jason Roy and the attempted premeditated murder of Kira C. Mendez argues that the record does not contain substantial evidence of premeditation and deliberation with respect to either conviction. We disagree and affirm.

BACKGROUND

The events underlying Mendez's convictions took place in October 2022. Roy and Kira were in a romantic relationship and had been living together for one and one-half years. Mendez is the former boyfriend of Roy's sister. Mendez and Roy's sister had not been a couple for several months, but he and Roy continued to see each other. Mendez and Roy would "hang out," play video games online, or drink together. But Kira did not trust Mendez and did not like being around him. Mendez and Roy were involved in some sort of "drug activity" together.

Mendez arrived at Roy and Kira's apartment after midnight one night. Kira was in the bedroom and could see Roy and Mendez in the living room; the bedroom had no door. The two men were having a casual conversation and preparing some marijuana to smoke. Roy brought a marijuana cigar to Kira in the bedroom, and she smoked some and took it back to Roy in the living room. Roy and Mendez "were having a business conversation." Kira tried to stay out of Roy's "business," and Roy tried to keep her away from it, so she did not overhear any details. At some point, Mendez came into the bedroom and asked Kira "what happened to the stuff that he gave" Roy. She understood

2

that Mendez was referring to cocaine. (Although Roy tried to keep her away from his business, she had seen cocaine around.) She told Mendez that she had "'no clue about what [they had] going on.'" He continued to press her and insisted that she knew something. Roy stepped between Mendez and Kira and said that Kira had "nothing to do with this" and that it was not her place to answer Mendez's questions. Mendez continued to insist that Kira knew something, and she again told him that she did not know anything.

Mendez then returned to the living room, pulled a gun out of his pocket, and pointed it at Roy and Kira. Roy appeared to be shocked and said something like, "'Are you serious?' . . . 'Do you really have to take it there?'" He was not confrontational or aggressive with Mendez. Roy and Kira took a few steps into the living room, and Mendez asked for their cell phones. Roy did not own a cell phone, but Kira handed her phone to Mendez. Mendez ordered Roy to the ground, and Roy lay face down. Mendez pointed the gun at Kira as he searched Roy's pockets. According to Kira's trial testimony, the next thing that she remembered was waking up on the floor in the living room. She could feel that she was bleeding from the back of her head and knew that she had been shot. She crawled out of the apartment and yelled for help. A neighbor called 911, and Kira identified Mendez as the shooter during the recorded call. The neighbor also saw Roy, who was unresponsive, inside the apartment.

The responding police officers found Roy lying on his back with a gunshot wound to his head. They did not find any weapons on him or around him, but they found a nine-millimeter shell casing on the floor near him. They found another nine-millimeter shell casing on the floor next to the living room wall. Kira said that Roy had one gun. Officers found the gun in a drawer in the bedroom closet. The gun used .40-caliber ammunition.

According to the forensic pathologist, Roy had an entrance wound in front of his left ear and an exit wound on the right side of his head. The entrance wound was a contact shot, so the gun's muzzle was touching Roy's skin or was near his skin when it was fired. The gunshot wound caused his death. Roy had some scars and a few scabs on his body but no other wounds.

Kira was treated for a depressed skull fracture and brain hemorrhaging as a result of the gunshot wound to the back of her head. She had bullet fragments embedded in the soft tissue of her scalp.

The People charged Mendez with the murder of Roy, the attempted premeditated murder of Kira, and unlawfully possessing a firearm as a felon. (Pen. Code, §§ 187, 664, 29800, subd. (a)(1); unlabeled statutory citations refer to the Penal Code.) With respect to the murder and attempted murder counts, the operative information alleged that Mendez personally and intentionally discharged a firearm, causing great bodily injury or death to another person. (§ 12022.53, subd. (d).)

4

In April 2024, a jury found Mendez guilty of first degree murder, attempted premeditated murder, and the firearm possession offense.[1] The jury also found the firearm enhancements true. The trial court sentenced Mendez to a determinate term of 16 months in prison and an indeterminate term of 82 years to life in prison.

DISCUSSION

Mendez contends that the record does not contain substantial evidence to support a finding of premeditation and deliberation with respect to his murder and attempted murder convictions. We disagree.

"'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] The reflection may be arrived at quickly; it need not span a specific or extended period of time." (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355.) "'"The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 332.)

Evidence of planning, preexisting motive, and the manner of killing bears on whether a murder or attempted murder was premeditated and deliberate. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*); *People v. Gonzalez* (2012) 54 Cal.4th 643, 663-664.) But those three factors—referred to as the *Anderson* factors—"are

---

[1] The court instructed the jury on only one theory of first degree murder—willful, deliberate, and premeditated murder.

5

descriptive and neither normative nor exhaustive," so "reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.) The *Anderson* factors are merely "a framework to aid in appellate review," and they do not "define the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

We review the jury's finding of premeditation and deliberation for substantial evidence. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.) We review "the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.) We draw all reasonable inferences in support of the judgment, and we defer to the jury's credibility determinations and resolution of conflicts in the evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Mendez argues that there is insufficient evidence of each *Anderson* factor, but we disagree. With respect to motive, the record shows that Mendez and Roy were involved in "drug activity" together, and the two had a disagreement over missing cocaine. Mendez believed that Kira knew where the cocaine was, and Roy and Kira insisted that she knew nothing about it. Mendez eventually grew frustrated with their denials and drew his gun. The jury could reasonably infer that Mendez shot the victims because he believed that they had taken the drugs. (See *People v. Bolin*, *supra*, 18 Cal.4th at

6

pp. 309-310, 332 [motive evidence showed that the defendant killed his partner in the marijuana trade right after the partner revealed the marijuana crop to strangers].)  The jury also could reasonably infer that Mendez shot Roy because he was responsible for the missing cocaine, and Mendez tried to kill Kira because she witnessed Roy's killing.  Either reasonable inference would lead to the conclusion that Mendez had a motive to kill the victims.

The evidence as to planning and the manner of killing also supports the jury's findings.  Officers found only Roy's .40-caliber gun, but the forensic evidence showed that Roy and Kira were shot with nine-millimeter ammunition.  The officers found Roy's gun stored in a drawer in the bedroom closet, nowhere near Roy's body and the two nine-millimeter shell casings.  Kira said that Mendez drew the gun from his pocket.  The jurors could reasonably conclude that Mendez brought his own gun to Roy and Kira's apartment that night with the plan to use it against them if a perceived need arose.  Mendez apparently determined that he needed to use lethal force after the victims could not or would not disclose what happened to the cocaine.  He left the bedroom and returned to the living room, pulled the gun out of his pocket, ignored Roy's attempt to reason with him, demanded their cell phones, ordered Roy to the floor, and searched Roy while pointing the gun at Kira.  Mendez thus ensured that Roy was not armed and that neither victim had a way to call for help.  All of that evidence shows that Mendez had plenty of time to reflect and reach a decision to kill Roy and Kira.  And although Kira

7

could not remember anything after that, the forensic evidence shows that Mendez put the gun to Roy's head and shot him. Kira was shot in the back of the head. There is no evidence of a struggle between Mendez and the victims. The evidence instead "indicates an execution-style murder" and supports a reasonable inference that Mendez's actions were "'cold and calculated.'" (*People v. Hawkins* (1995) 10 Cal.4th 920, 957, disapproved on another ground by *People v. Lasko* (2000) 23 Cal.4th 101, 110; accord, *People v. Thomas* (1992) 2 Cal.4th 489, 518 ["Both victims were killed by single contact shots" to the head and neck, "a method sufficiently ""particular and exacting"" to warrant an inference that defendant was acting according to a preconceived design"].)

Mendez focuses mostly on evidence found sufficient in other cases and contrasts it with the evidence in this case. But his "comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas*, *supra*, 2 Cal.4th at p. 516.) It is irrelevant whether other evidence might have strengthened the People's case, as long as there is sufficient evidence to support the jury's findings. (*People v. Vargas* (2020) 9 Cal.5th 793, 821-822.) The evidence here is more than sufficient.

For all of these reasons, we conclude that substantial evidence supports the jury's finding that Mendez committed premeditated and deliberate murder and attempted murder.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____

J.

We concur:

McKINSTER _____

Acting P. J.

MILLER _____

J.

9